718 So.2d 144 (1998)
Brandy Bain JENNINGS, Appellant,
v.
STATE of Florida, Appellee.
No. 89550.
Supreme Court of Florida.
September 10, 1998.
*145 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
Brandy Bain Jennings was convicted of robbing the Cracker Barrel Restaurant in Naples, Florida, and of murdering three restaurant employees in the process. He received three separate death sentences, one for each of the murders, and was sentenced to fifteen years' imprisonment for the robbery. Jennings now appeals his convictions and sentences. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons expressed herein, we affirm Jennings' convictions and sentences.[1]
Dorothy Siddle, Vicki Smith, and Jason Wiggins, all of whom worked at the Cracker Barrel Restaurant in Naples, were killed during an early morning robbery of the restaurant on November 15, 1995. Upon arriving on the scene, police found the bodies of all three victims lying in pools of blood on the freezer floor with their throats slashed. Victim Siddle's hands were bound behind her back with electrical tape; Smith and Wiggins both had electrical tape around their respective left wrists, but the tape appeared to have come loose from their right wrists.
Police also found bloody shoe prints leading from the freezer, through the kitchen, and into the office, blood spots in and around the kitchen sink, and an opened office safe surrounded by plastic containers and cash. Outside, leading away from the back of the restaurant, police found scattered bills and coins, shoe tracks, a Buck knife,[2] a Buck *146 knife case, a pair of blood-stained gloves, and a Daisy air pistol.[3]
Jennings (age twenty-six) and Jason Graves (age eighteen), both of whom had previously worked at the Cracker Barrel and knew the victims, were apprehended and jailed approximately three weeks later in Las Vegas, Nevada, where Jennings ultimately made lengthy statements to Florida law enforcement personnel. In a taped interview, Jennings blamed the murders on Graves, but admitted his (Jennings') involvement in planning and, after several aborted attempts, actually perpetrating the robbery with Graves. Jennings acknowledged wearing gloves during the robbery and using his Buck knife in taping the victims' hands, but claimed that, after doing so, he must have set the Buck knife down somewhere and did not remember seeing it again. Jennings further stated that he saw the dead bodies in the freezer and that his foot slipped in some blood, but that he did not remember falling, getting blood on his clothes or hands, or washing his hands in the kitchen sink. Jennings also stated that the Daisy air pistol belonged to Graves, and directed police to a canal where he and Graves had thrown other evidence of the crime.
In an untaped interview the next day, during which he was confronted with inconsistencies in his story and the evidence against him, Jennings stated, "I think I could have been the killer. In my mind I think I could have killed them, but in my heart I don't think I could have."
At trial, the taped interview was played for the jury, and one of the officers testified regarding Jennings' untaped statements made the next day. The items ultimately recovered from the canal were also entered into evidence.[4]
The medical examiner, who performed autopsies on the victims, testified that they died from "sharp force injuries" to the neck caused by "a sharp-bladed instrument with a very strong blade," like the Buck knife found at the crime scene. A forensic serologist testified that traces of blood were found on the Buck knife, the Buck knife case, the area around the sink, and one of the gloves recovered from the crime scene, but in an amount insufficient for further analysis. An impressions expert testified that Jennings' tennis shoes recovered from the canal matched the bloody shoe prints inside the restaurant as well as some of the shoe prints from the outside tracks leading away from the restaurant.
The State also presented testimony concerning previous statements made by Jennings regarding robbery and witness elimination in general. Specifically, Angela Chainey, who had been a friend of Jennings', testified that about two years before the crimes Jennings said that if he ever needed any money he could always rob someplace or somebody. Chainey further testified that when she responded, "That's stupid. You could get caught," Jennings replied, while making a motion across his throat, "Not if you don't leave any witnesses." On cross-examination, Chainey further testified that Jennings had "made statements similar to that several times."
The State also presented testimony concerning previous statements made by Jennings regarding his dislike of victim Siddle. Specifically, Bob Evans, one of the managers at Cracker Barrel, testified that Jennings perceived Siddle to be holding him back at work and that, just after Jennings quit, he said about Siddle, "I hate her. I even hate the sound of her voice." Donna Howell, who also worked at Cracker Barrel, similarly testified that she was aware of Jennings' animosity and dislike of Siddle, and that Jennings had once said about Siddle, "I can't *147 stand the bitch. I can't stand the sound of her voice."
The jury found Jennings guilty as charged. In the penalty phase, the defense presented mitigation evidence, including general character testimony from witness Mary Hamler, who testified on direct examination that she had lived with Jennings for two and one-half years. She also testified that Jennings had gotten along well with her children during that time, and that he cried when they (Jennings and Hamler) broke up.
On cross-examination, the State elicited testimony from Hamler that there was another side to Jennings' character and that Jennings once said that if he ever committed a robbery, he would not be stupid enough to stick around, but would go north. Hamler further testified on cross-examination that Jennings was angry at Cracker Barrel in general, and Siddle in particular, for "jerking him around" and holding him back at work, and that in this regard Jennings once said of Siddle that "one day she would get hers."
The defense presented further character evidence from several of Jennings' friends that he was good with children, got along with everybody, and was basically a nonviolent, big-brother type who was happy-go-lucky, fun-loving, playful, laid back, and likeable. Jennings' mother testified that her son never met his father and that she raised Jennings herself. She claimed that Jennings had been a straight-A student, but quit school to take care of her when she became sick.
The jury recommended death by a vote of ten to two as to each of the murders. In its sentencing order, the trial court found three aggravators: (1) that the murders were committed during a robbery; (2) that they were committed to avoid arrest; and (3) that they were cold, calculated, and premeditated (CCP).
The trial court found only one statutory mitigator: that Jennings had no significant history of prior criminal activity (some weight). The trial court explicitly found that two urged statutory mitigators did not exist: that Jennings was an accomplice in a capital felony committed by another and that his participation was relatively minor; and that Jennings acted under extreme duress or under the substantial domination of another person. The trial court also found eight nonstatutory mitigators: (1) that Jennings had a deprived childhood (some weight); (2) that accomplice Graves was not sentenced to death (some weight); (3) that Jennings cooperated with police (substantial weight); (4) that he had a good employment history (little weight); (5) that he had a loving relationship with his mother (little weight); (6) that he had positive personality traits enabling the formation of strong, caring relationships (some weight); (7) that he had the capacity to care for and be mutually loved by children (some weight); and (8) that he exhibited exemplary courtroom behavior (little weight).
After evaluating the aggravators and mitigators, the trial court sentenced Jennings to death for each murder. The trial court also sentenced Jennings to fifteen years' imprisonment for the robbery. Jennings now appeals his convictions and sentences.

Denial of Motion to Suppress
Jennings filed a pretrial motion to suppress the statements he made to Florida law enforcement personnel while in custody in Las Vegas. He urged that the statements had been obtained in violation of his constitutional rights against self-incrimination. See U.S. Const. amend. V; art. I, § 9, Fla. Const.
At the suppression hearing, Detective Rose of the Collier County Sheriff's Office testified that Jennings was initially advised of his Miranda[5] rights and signed a waiver thereof, but that during questioning Jennings invoked his right to counsel. Detective Rose testified that he thereafter ceased questioning Jennings.
Investigator Cunningham of the State Attorney's Office testified that upon arriving in Las Vegas the next day, he did not attempt to talk to Jennings because he was advised that Jennings did not want to talk. However, Investigator Cunningham testified that the next day he and Detective Rose went to the jail to talk to Graves (not Jennings) and, *148 after doing so, they saw Jennings at the booking desk as they were exiting the building.
Investigator Cunningham further testified that it was Jennings who spoke first by asking Investigator Cunningham and Detective Rose if his mother had contacted them. Investigator Cunningham responded that she had not, whereupon Jennings said that he had talked to his mother, who advised Jennings to talk to the police, and that, based on that conversation, he wanted to do so. Investigator Cunningham testified that he then advised Jennings of his Miranda rights and held an unrecorded initial conversation with Jennings, immediately after which Jennings consented to a taped interview.
Investigator Cunningham and Detective Rose prepared to again advise Jennings of his Miranda rights during the taped interview, whereupon Jennings stated, "Well, if you want me to save you the trouble, I understand all my rights fully." Detective Rose nevertheless again advised Jennings of his Miranda rights, which Jennings orally waived, and the taped interview ensued.
Investigator Cunningham testified that the next day Jennings was again orally advised of his Miranda rights, and then executed a written waiver of those rights. Upon being confronted with inconsistencies in his story and the evidence against him, Jennings made the incriminating statement that he thought he could be the killer.
The trial court ultimately denied Jennings' suppression motion, finding that "the contact between the Defendant and these two representatives of the State was voluntarily initiated on the part of the Defendant and that he knowing[ly], intelligently, and voluntarily waived" his Miranda rights. Jennings now argues, however, that any waiver of his Miranda rights on the day of the taped interview could not have been knowing, intelligent, and voluntary because when he invoked his right to counsel the previous day, Detective Rose simply offered to get him a Las Vegas telephone book.[6] Jennings asserts that Detective Rose's response was inadequate.
We need not reach the question of whether Detective Rose's response to Jennings' request for counsel was inadequate as a matter of constitutional principle.[7] In this case, the evidence is undisputed that the police ceased questioning Jennings when he invoked his *149 right to counsel, and that it was Jennings who reinitiated contact with police.
In Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (Emphasis added). This Court has likewise held that
[o]nce a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.

Traylor v. State, 596 So.2d 957, 966 (Fla. 1992) (footnote omitted) (emphasis added); see also Davis v. State, 698 So.2d 1182, 1189 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1076, ___ L.Ed.2d ___ (1998).
This Court applied the reasoning of Edwards and Traylor in Stein v. State, 632 So.2d 1361 (Fla.1994). The defendant in Stein was arrested for two murders and signed a waiver-of-rights form. See id. at 1363. The defendant then asked to speak to an attorney, and the questioning was terminated. See id. However, one of the investigators made a comment to the defendant that God would forgive him for what he had done. See id. The defendant was then left alone in the interview room and several minutes later, but before the defendant had seen an attorney, the defendant initiated contact with the investigators by knocking on the door and stating, "I want to talk about part of it." Id. at 1364. The police then had the defendant execute a second waiver-of-rights form, on which a notation was made that the defendant had initiated the conversation. See 632 So.2d at 1364. The defendant thereupon made incriminating statements to police. See id.
In rejecting arguments that the statements should have been suppressed, this Court held:
Clearly, once an accused asks for counsel, an accused may not be subjected to further interrogation until counsel has been made available to the accused, absent initiation of further communication with law enforcement officers by the accused. Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Under the circumstances of this case, however, we find that [the defendant] voluntarily initiated continued communication with the investigators and that the motion to suppress was properly denied. At the suppression hearing, [the defendant] himself admitted that the brief conversation about God had no effect on his decision to talk to the investigators.
Id.
A determination of the issues of both the voluntariness of the confession and a knowing and intelligent waiver of Miranda rights requires an examination of the totality of the circumstances. See Traylor, 596 So.2d at 964. Looking at the totality of circumstances in the present case, the trial court found not only that Jennings knowingly and intelligently waived his Miranda rights, but also that the "contact between the Defendant and these two representatives of the State was voluntarily initiated on the part of the Defendant." We agree with the trial court's findings, which are unquestionably supported by the record. Jennings was advised as part of his initial Miranda warnings of his right to have a lawyer appointed to represent him before questioning if he could not afford one. The record is undisputed that after Jennings said he wanted a lawyer, Detective Rose ceased questioning him.
Importantly, the record further confirms that Jennings' reinitiation of conversation with Detective Rose and Investigator Cunningham the next day was motivated not by any misapprehension of this right or "taint" of the telephone book scenario, but by an interceding conversation between Jennings and his mother, wherein she advised Jennings to talk to the police. During the taped interview, Jennings acknowledged that the *150 reason he decided to talk to police was because his mother advised him to do so.
Moreover, upon Jennings' reinitiation of conversation with police, he was again advised of his Miranda rights, including his right to have a lawyer appointed to represent him before questioning if he could not afford one. Thereafter, at the beginning of the taped interview when Detective Rose and Investigator Cunningham prepared to again advise Jennings of his Miranda rights, Jennings stated that he could save them the trouble because he understood his rights fully. Despite this, Detective Rose again advised Jennings of his Miranda rights, once again including his right to have a lawyer appointed to represent him before questioning if he could not afford one.[8] The record also indicates that, before making his subsequent untaped statement the next day, Jennings was again advised of his Miranda rights and executed a written waiver of same.
In short, the totality of the circumstances establishes that even if Jennings invoked his right to counsel, see State v. Owen, 696 So.2d 715 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997), he voluntarily initiated further contact with the police. He gave the statements he now seeks to suppress after voluntarily, knowingly, and intelligently waiving his Miranda rights. No violation of Miranda or Jennings' constitutional right against self-incrimination occurred in this case. We accordingly affirm the trial court's denial of Jennings' motion to suppress his subject statements to police.

The Avoid Arrest Aggravator
Jennings does not challenge the aggravator that the murders were committed during a robbery. However, he challenges the two remaining aggravators: that the murders were committed to avoid arrest and that they were cold, calculated, and premeditated.[9]
Jennings argues that the trial court erred in finding the avoid arrest aggravator. We disagree.
In finding this aggravator, the trial court ruled:
The evidence was undisputed that this defendant and the co-defendant (whose trial preceded the trial of this case and who was convicted of the same crimes as this defendant) were former employees of the Crackerbarrel [sic] Restaurant. As such, they were well known to the three victims. Found in the defendant's truck when the defendants were arrested in Las Vegas, Nevada, were two pullover masks, similar to ski masks. These were not used in these crimes, nor were they discarded with the other items of apparel in the canal. The defendants disdained the use of masks in these crimes. The use of gloves by the defendants shows further support for the conclusion that these murders were committed by the defendant for the purpose of avoiding or preventing a lawful arrest. Approximately two years before these crimes, this defendant, in discussing a hypothetical robbery, said, and indicated, by moving his fingers across his throat, that if he robbed someone he could not be caught because he would not leave any witnesses.
While the murder of Dorothy Siddle was undoubtedly motivated in part by defendant's dislike for her, the evidence, including *151 the murders of the other two victims, makes it manifest that the dominant motive for these murders was the elimination of witnesses in order to avoid prosecution. This aggravating circumstance was proven beyond a reasonable doubt.
The avoid arrest aggravator focuses on the motivation for the crimes. See Stein, 632 So.2d at 1366. As this Court stated in Consalvo v. State, "the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness," and "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." 697 So.2d 805, 819 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1681, 140 L.Ed.2d 819 (1998).
In Riley v. State, 366 So.2d 19 (Fla.1978), this Court for the first time broadened the application of the avoid arrest aggravator to encompass the murder of a witness to a crime in addition to law enforcement personnel. However, this Court cautioned that
the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement official. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases.
Id. at 22; see also Gore v. State, 706 So.2d 1328, 1334 (Fla.1997).
In Riley, the defendant and an accomplice entered the business where the defendant worked for the purpose of robbing it. See 366 So.2d at 20. They then threatened the defendant's three present coworkers with pistols, forced them to lie on the floor, bound and gagged them, and then shot them in the head. See id. In light of the fact that the victims knew the defendant and were immobilized and rendered helpless, coupled with one of the perpetrator's expressed concern for subsequent identification, this Court found that the record supported only one interpretationthat the victims were killed to avoid identification. See id. at 22.
Here, as in Riley, it is significant that the victims all knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, see Consalvo, 697 So.2d at 819, there was further evidence presented that Jennings used gloves, did not use a mask, and stated that if he ever committed a robbery, he would not leave any witnesses.
Also, the facts of the present case show that the victims had been bound. Victim Siddle's hands were bound behind her back with electrical tape when her throat was slashed. While the remaining two victims (Smith and Wiggins) had freed their hands, no evidence of their resistance (i.e., defensive wounds on Jennings, fingernail scrapings from the victims, etc.) was entered into evidence. Further, all three victims were confined to the freezer, and any immediate threat to Jennings could have been eliminated by simply closing and securing the freezer door. Instead, Jennings slashed the throats of all three victims.
As recognized by the trial court, based on the evidence in this case there was no reason to kill at least two of the victims except to eliminate them as witnesses to the first murder. See, e.g., Willacy v. State, 696 So.2d 693, 696 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997); Thompson v. State, 648 So.2d 692, 695 (Fla. 1994); Correll v. State, 523 So.2d 562, 568 (Fla.1988). Further, the manner of killing here (consecutive throat slashings) was not of a nature that could be considered reactionary or instinctive and further supports the finding that the dominant motive for killing at least two of the victims was to avoid identification. Cf. Robertson v. State, 611 So.2d 1228, 1232 (Fla.1993) (finding insufficient evidence to support avoid arrest aggravator where "[t]he facts indicate that [the appellant] shot [the victim] instinctively and without a plan to eliminate her as a witness"). Accordingly, we find substantial competent evidence to support the trial court's finding that, beyond a reasonable doubt, the dominant motive for the murders of two of the victims was the elimination of witnesses in order to avoid prosecution.

CCP
Jennings next argues that the trial court erred in finding the CCP aggravator. We again disagree.
In finding CCP, the trial court explained:

*152 In the space of approximately ten minutes, the defendants gained entry into the Cracker Barrel Restaurant, forced Dorothy Siddle to open the safe, put all three victims on the floor, taped their hands behind them, marched them into the freezer, cleaned out the safe, cut the throats of the three victims, and fled out the back door when they heard another employee buzzing the front door for entry to work. This approximate time span was established by the testimony of an employee of the security company whose computer monitors the opening of the doors at the Cracker Barrel Restaurant and the arriving employee who buzzed the front door. The murder weapon, a large Buck folding knife, was this defendant's. While he says the co-defendant must have killed the victims, it is this defendant who told a witness two years earlier that if he committed a robbery he wouldn't be caught because he would leave no witnesses. This defendant's dislike for victim, Dorothy Siddle, was known to several witnesses who testified to his bitterness towards her. These three murders and the robbery, occurring with the rapidity described above, manifest a plan that was carried out with ruthless efficiency. Additionally, this defendant took the time to walk from the freezer where the victims were slain to the lavatory where, from blood on the lavatory, it is obvious he washed himself and the murder weapon. Traces of blood were still on the knife when it was found although not of sufficient quantity to specifically identify the traces. His bloody footprints trace his movement and activity. The defendant admitted that he and the co-defendant had attempted to commit the robbery on several prior occasions shortly before November 15, 1996[sic], the date of these crimes, and during these aborted attempts they had actually prevailed on victim, Dorothy Siddle, to call a towing service for defendant's truck.... This aggravating circumstance was proven beyond a reasonable doubt.
This Court has recognized that, in order to prove the CCP aggravator, the State must prove beyond a reasonable doubt each of four elements: (1) the murder was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); (2) the defendant had a careful plan or prearranged design to commit the murder before the fatal incident (calculated); (3) the defendant exhibited heightened premeditation (premeditated); and (4) the defendant had no pretense of moral or legal justification. See Walls v. State, 641 So.2d 381, 387-88 (Fla.1994).
All four elements are established here. As found by the trial court, the most salient fact of these murders is the ruthless efficiency with which the murders were carried out in conjunction with the robbery. The methodic succession of events cited in the trial court's order supports a conclusion that the murders were not committed in an "emotional frenzy, panic or a fit of rage." Id. at 387.
The scenario of events supports the elements of a calculated plan and heightened premeditation. We begin with witness Chainey's testimony that, approximately two years before these crimes, Jennings made general statements and gestures to the effect that if he ever needed any money, he would simply rob someplace or someone and eliminate any witnesses by slitting their throats. Moreover, Jennings admitted to several aborted robbery attempts of the Cracker Barrel in close proximity to the actual crimes that he ultimately committed there.
Evidence of a plan to commit a crime other than murder (such as, in this case, robbery) is in and of itself insufficient to support CCP. See, e.g., Castro v. State, 644 So.2d 987, 991 (Fla.1994). However, the execution-style murders, combined with the advance procurement of the murder weapon, the previously expressed dislike for victim Siddle, and the previously expressed intent not to leave any victims if robbery were committed are all additional factors that support the elements of a calculated plan and heightened premeditation. The evidence here does not suggest a "robbery gone bad." Cf. Rogers v. State, 511 So.2d 526, 533 (Fla. 1987); Hansbrough v. State, 509 So.2d 1081, 1086 (Fla.1987).
"Cold, calculated, premeditated murder can be indicated by the circumstances showing such facts as advance procurement of a *153 weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." Bell v. State, 699 So.2d 674, 677 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1067, 140 L.Ed.2d 127 (1998). All of these circumstances are present here.
Finally, Jennings makes no argument of moral or legal justification for the killing. Here, just as this Court found under analogous facts in Walls, 641 So.2d at 388, there was
no evidence, much less a colorable claim, establishing a pretense of moral or legal justification.... [T]here is no construction of the facts that would support even a fragmentary claim of excuse or justification, or of a defense to homicide, because the victim here was prostrate and helpless when [the appellant] returned to kill her.
Thus, we find that substantial competent evidence supports the trial court's finding of CCP. In so finding, we reject Jennings' argument that the trial court impermissibly doubled the CCP and avoid arrest aggravators in his case. "So long as each aggravator is supported by ... distinct facts, we hold that no impermissible doubling of [these] aggravating factors [occurs]." Stein, 632 So.2d at 1366. In the present case, although both aggravators share certain facts, they are each also supported by facts distinct from the other and are supported by different aspects of the crime. For example, the avoid arrest aggravator is supported by the distinct fact that the victims knew Jennings and that Jennings made prior statements concerning witness elimination. The CCP aggravator is supported by distinct facts regarding the method of execution (including the ruthless efficiency), and the previously expressed animosity toward victim Siddle. We find no impermissible doubling here.

Disparate Sentence
Jennings' accomplice, eighteen-year-old Jason Graves, was also convicted of the murders but was sentenced to life imprisonment for each of the murders. Jennings now argues that his death sentences are impermissibly disparate from Graves' sentences of life imprisonment. While the death penalty is disproportionate where a less culpable defendant receives death and a more culpable defendant receives life, see Hazen v. State, 700 So.2d 1207, 1211-14 (Fla.1997), disparate treatment of codefendants is permissible in situations where a particular defendant is more culpable. See Larzelere v. State, 676 So.2d 394, 406-07 (Fla.), cert. denied, ___ U.S. ___, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). Although Jennings urges equal culpability with codefendant Graves in the present case, the trial court resolved this issue against Jennings in discussing Graves' disparate life sentence as a mitigating factor:
The co-defendant, Charles Jason Graves, was tried on these same charges two weeks prior to this defendant, before the undersigned judge. The state had entered an agreement in open court to waive the death penalty for Graves in exchange for his waiver of a motion for a continuance to allow more time to adequately prepare for a trial where the death penalty was contemplated. Graves was eighteen years old at the time of the crimes. While Graves admitted to possessing what could be best described as a crude, homemade knife at the crime scene (it was in evidence in both trials as were virtually all the evidentiary exhibits) the medical examiner involved in the autopsies of the victims, Dr. Borges, testified in this case that Graves' crude knife was incapable of the kinds of wounds inflicted on the victims; and further that the large Buck knife admittedly belonging to this defendant was consistent with the mortal wounds to the victimsparticularly the two victims whose spines bore slashing injuries from the murder weapon.... [T]he evidence is overwhelming that this defendant wielded the knife in murdering the victims. There was only one set of bloody footprints leading from the freezer and these belonged to this defendant as evidenced by his own admissions and the testimony of a forensic expert (Mr. Grimes); the photographic comparisons and actual floor mat removed from the crime scene by investigators are inconsistent with any other possibility. As previously observed, this defendant also admitted to the killings by saying in his mind he knew he killed the victims even if his heart *154 could not accept it. This evidence was all before the jury in the guilt phase and the penalty phase. This court judicially noticed and instructed the jury during the evidentiary portion of the penalty phase that the co-defendant could only receive a life sentence for these crimes. The state's waiver of the death penalty as to Graves, whether for the stated reason of avoiding a continuance, or because the evidence in both these cases was such that the death penalty was more problematic in the co-defendant's case, nevertheless is found by this court to be a mitigating factor.
This thorough analysis by the trial court indicates that not only was the issue of the codefendant's life sentence presented to the jury as a mitigating factor, but also that the trial court carefully considered relative culpability. As established in the record, Graves was only eighteen, whereas Jennings was twenty-six, at the time of the murders. The trial judge, who presided at both trials, concluded independently that Jennings was the actual killer and thus more culpable than Graves. Moreover, despite finding that Jennings was more culpable and the actual killer, the trial court did consider and instruct the jury on the fact that the codefendant received a life sentence as a result of the State's waiver of the death penalty as a mitigating factor.
Contrary to Jennings' argument, the fact that the State argued in Graves' trial that Graves was the "leader" in the robbery is not necessarily inconsistent with the argument (and the trial court's finding) that Jennings was the actual murderer. As further found by the trial court below:
The prosecution took the same position in both trialsthat this defendant wielded the knife and actually killed the three victims while Graves remained outside the freezer door with the pellet pistol which closely resembled a Colt .45 semi-automatic pistol assisting in the confinement of the victims to the freezerbecause two of the victims were found with their hands partially freed from the electrical tape with which their hands were bound behind their backs. The evidence is consistent with the position taken by the state.
We find no abuse of discretion in the trial court's ruling on this issue. The fact that the eighteen-year-old codefendant received life does not prevent the imposition of the death penalty on Jennings, whom the trial court found to be the actual killer and to be more culpable.

Sufficiency of the Evidence/Proportionality
Though not directly raised by Jennings, we turn now to our required independent review of the sufficiency of the evidence as well as the proportionality of Jennings' death sentences as compared to other cases where we have affirmed death sentences. See Terry, 668 So.2d at 965; Porter v. State, 564 So.2d 1060, 1064 (Fla.1990).
We have independently reviewed the evidence in the present case, see Parker v. Dugger, 660 So.2d 1386 (Fla.1995), including Jennings' inculpatory statements made to law enforcement personnel, his ownership of the murder weapon, and his bloody shoe prints leading from the murder scene. The evidence also includes general testimony regarding not only Jennings' dislike of Cracker Barrel and Siddle, but also his past statements about committing a robbery and not leaving any witnesses. We conclude as a matter of law that the evidence is sufficient to support Jennings' murder convictions.
Further, based on our review of all of the aggravating and mitigating factors, including their nature and quality according to the specific facts of this case, we find that the totality of the circumstances justifies the imposition of the death sentence, see Porter, 564 So.2d at 1064, and that this case is proportionate to other cases where we have upheld the imposition of a death sentence. See, e.g., Stein (affirming death sentences where, inter alia, murders were cold, calculated, and premeditated and committed during armed robbery to avoid arrest, and defendant had no significant history of prior criminal activity); LeCroy v. State, 533 So.2d 750 (Fla.1988) (affirming death sentence where, inter alia, murder was committed during course of armed robbery to avoid arrest, and defendant had no significant history of prior criminal activity).
*155 Based on the foregoing analysis of the issues, we affirm Jennings' convictions and sentences.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW, KOGAN, WELLS, ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] We do not address Jennings' challenge to his robbery sentence, as it was not preserved below. See generally Terry v. State, 668 So.2d 954, 961 (Fla.1996) (citing Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)).
[2] According to testimony at trial, a "Buck knife" is a particular brand of very sharp, sturdy knife that has an approximately four and one-half inch black plastic handle, into which folds the blade of the knife.
[3] According to testimony at trial, a Daisy air pistol is like a pellet gun, but looks almost identical to a Colt .45 semi-automatic pistol.
[4] The evidence from the canal consisted of: clothes, gloves, socks, and shoes that Jennings said were worn during the crime; a homemade razor/scraper-blade knife and sheath that Jennings said belonged to Graves; packaging from a Daisy pellet gun and CO2 cartridges; unused CO2 cartridges and pellets; money bags (one marked "Cracker Barrel"), bank envelopes, money bands, Cracker Barrel deposit slips, and some cash and coins; personal checks, travelers' checks, and money orders made out to Cracker Barrel; a clear plastic garbage bag; and rocks to weigh down the bundle of evidence.
[5] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[6] Specifically, Detective Rose testified as follows on cross-examination by the defense at the suppression hearing:

Q. What did [Jennings] tell you?
A. He said that he wanted a lawyer or something to that effect.
Q. What was your response to that?
A. I asked him if that's what he wanted.
Q. And did you go any further?
A. Not really.
Q. Any questioning?
A. Not from me, no.
Q. Specifically, did you hand him a phone book and say, "Here is a phone book. Call any lawyer in Las Vegas"?
A. No. I did offer him one though.
Q. Was that your response to providing an attorney for him?
A. Yes.
Q. Just hand him a phone book and say, "call"?
A. No, I asked him if he wanted to see one. I told him I could get him one.
Q. Did you tell him that if he wanted a lawyer, that you would see that he got one if he couldn't afford it?
A. That was explained to him prior, when [another detective] read the Miranda Warnings to him.
Q. So is your testimony that when he asked for a lawyer, you gave him a phone book, a Las Vegas phone book and said he could contact any lawyer he wanted to?
A. I never gave him a phone book, no.
Q. Okay. You said you could give him one?
A. Certainly.
Q. And that ended your conversation with him?
A. Pretty much, my conversation with Mr. Jennings.
[7] Jennings argues that once he requested counsel, the police had an affirmative duty under Florida Rule of Criminal Procedure 3.111(c) to "immediately and effectively place the defendant in communication with the (office of) public defender of the circuit in which the arrest was made." To the extent that Jennings did not specifically raise this procedural argument below, he is precluded from doing so now. See generally Terry, 668 So.2d at 961. Even assuming otherwise, rule 3.111(c) is inapplicable to the facts of this case. By its very terms, the rule applies to booking officers' committing a defendant to custody, not to, as here, interrogating officers' questioning a defendant already in custody.
[8] That Detective Rose and Investigator Cunningham failed to have Jennings execute a written waiver of his Miranda rights in conjunction with the taped interview is not determinative. As this Court held in Johnson v. State, 660 So.2d 637, 643 (Fla.1995), noncompliance with the written waiver requirement does not require reversal unless it has resulted in prejudice or harm to the defendant such that fundamental rights are implicated. No such prejudice or harm exists in the present case.

Furthermore, Jennings' reliance on Thompson v. State, 595 So.2d 16 (Fla.1992), is misplaced. In Thompson, this Court simply held that "the police must somehow communicate to the accused the basic idea of the right to consult a free attorney before being questioned." Id. at 17. The record here is clear that Detective Rose and Investigator Cunningham repeatedly advised Jennings of his right to consult a free attorney before being questioned, both after the telephone book scenario and before he made the taped and untaped statements at issue.
[9] Jennings raises two evidentiary issues related to the penalty phase: that the trial court erred in admitting masks into evidence and that the cross-examination of a character witness impermissibly exceeded the scope of direct. We reject these arguments without elaboration.