811 So.2d 661 (2002)
Robert Dwayne MORRIS, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. SC95623.
Supreme Court of Florida.
February 21, 2002.
*662 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General, and Scott A. Browne, Assistant Attorney General, Tampa, FL, for Appellee/Cross-Appellant.
PER CURIAM.
Robert Dwayne Morris appeals his convictions of first-degree murder, burglary, and armed robbery, and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Morris's convictions and sentence of death.[1]

I. MATERIAL FACTS

A. GUILT PHASE
On the morning of September 2, 1994, the body of the 88-year-old victim, Violet Livingston, was found in her Lakeland apartment by her son. When the police responded to the murder scene, they found the victim lying on her bedroom floor between two beds. Her head was wrapped tightly in bed sheets. There was blood on the walls, the furniture, and her walking *663 cane, which was on one of the beds. Both bedrooms were in disarray.
The point of entry to the apartment appeared to be the kitchen window on the south side of the apartment. The screen was off the window and was leaning against the building. The window was shut but the glass was broken. Window latches and broken glass were found on the ground. Near the window was a yellow chair sitting underneath the porch light. The porch light cover was off the fixture and was lying on the ground.
According to the associate medical examiner, Dr. Alexander Melamud, the victim died as a result of multiple injuries. She had sustained bruises, lacerations, abrasions, rib fractures, brain hemorrhage, and mechanical asphyxia due to suffocation. Some of the injuries were consistent with her having been beaten with her walking cane. There were neck injuries consistent with strangulation, and wounds to her right forearm, hand, and knee, which could be classified as defensive wounds. Dr. Melamud could not determine the sequence of the injuries, or when the victim became unconscious, but he determined she was alive for a short period of time after the attack began.
At trial, the four main categories of evidence the State presented against Morris were: (1) DNA test results; (2) Morris's fingerprint on a lightbulb outside the victim's residence; (3) Morris's possession of various items taken from the victim's residence; and (4) the testimony of Damion Sastre, a jailhouse informant. Additionally, the State presented further inculpatory evidence that Morris had healing scars on his forearms and hands, and that the police obtained a bloody glove from Morris's apartment.
First, the State's DNA experts testified that Morris could not be excluded as the source of the DNA obtained from two locations on the victim's body and from the kitchen curtain. According to the State's population geneticist, the frequency of this DNA pattern in the African-American database would be 1 in 7.1 million (meaning the chance that the DNA was not from Morris was between 1 in 710,000 to 1 in 71 million). Morris presented his own population geneticist, who testified that the frequency of the DNA pattern within the African-American population is 1 in 2.2 million.
Second, the police obtained a total of eleven fingerprints of value for comparison from the interior and exterior of the victim's apartment. No prints found inside the victim's apartment matched Morris's fingerprints. However, a single print, obtained from the partially unscrewed lightbulb outside the kitchen window, was later matched to Morris. Of the remaining prints, one print belonged to the victim's son, four belonged to a police department intern, and five were never matched to anyone.
Third, the police found several items known to have belonged to the victim in and around Morris's residence. These included coin wrappers, coin booklets, a coin sorter, and a television. Additionally, witnesses who worked at a sandwich shop and a gas station near the victim's apartment identified Morris as the man who purchased items with rare coins that were missing from the victim's coin collection.
Finally, Damion Sastre, a convicted felon, testified that Morris told him in jail that Morris committed the murder. Sastre testified that because Morris told Sastre that Morris had previously stolen a bicycle from the victim's apartment complex, Sastre suggested that Morris testify that he touched the lightbulb during that previous theft. However, Sastre also testified that Morris told him there was a screened porch into which Morris had to cut a slit to gain access to the victim's apartment, but then acknowledged, upon *664 being shown a photograph on cross-examination, that there was no screened porch to the victim's apartment.
Morris took the stand in his own defense and stated that he did not kill the victim or break into her apartment. He testified that he went to the victim's apartment complex to play basketball, but nobody was there. He then stated that he remembered that a friend had asked him if he could get a bicycle for her, so he walked to the back of the apartments and saw a bike on the top stairs. Morris admitted he unscrewed the lightbulb on the victim's porch and went upstairs. However, he testified that he was unable to obtain the bicycle because it was secured by a lock. He testified that on his way home, he found a brown paper sack containing a coin sorter, coin books, a chain necklace, and some little bags containing coins. He spent the coins in a neighborhood sandwich shop and a gas station. Morris further testified that he never told Sastre that he killed the victim, took coins out of her apartment, or gained entry through a screened porch. Finally, Morris testified that Sastre must have obtained the information about which Sastre testified by looking at Morris's discovery materials to which Sastre had access in prison.
The jury convicted Morris of first-degree murder, armed burglary of a dwelling or battery committed during burglary of a dwelling, and robbery with a deadly weapon.

B. PENALTY PHASE
The State introduced documents to establish Morris's two 1989 robbery convictions in Missouri based on two pursesnatching incidents, one of which resulted in the victim sustaining a fractured wrist; and to establish that Morris was on parole from those convictions at the time of the instant offense. The State also recalled the medical examiner, Dr. Melamud, who testified that the victim sustained at least thirty-one bruises, abrasions, and lacerations, including what Dr. Melamud classified as defensive wounds, and further testified that the injuries would have caused pain while the victim was conscious. The State also called a Florida Department of Law Enforcement bloodstain pattern expert, Leroy Parker, who testified that there was some movement of or by the victim within the bedroom during the time she received the forceful impacts, and that objects in the bedroom were in disarray, indicating a struggle. Finally, the State called the victim's two sons, a grandson, and a granddaughter as victim impact witnesses.
Morris, who was thirty-one years old at the time of the crime, called several family members to testify to the circumstances of his childhood, and Dr. Henry Dee, a clinical psychologist, to establish Morris's brain damage and learning disabilities. Dr. Dee categorized Morris's intelligence as borderline to dull-normal and opined that Morris suffered from attention deficit hyperactivity disorder. He also found evidence of diffuse frontal lobe brain damage, which is associated with increased impulsivity and an inability to control one's behavior, and noted that Morris's use of drugs, including marijuana, powdered cocaine, freebase, and rock cocaine, probably exacerbated his brain damage.
The jury recommended the death sentence by a vote of eight to four. The trial court found four aggravators,[2] one statutory *665 mitigator,[3] combined eight nonstatutory mitigators,[4] and found numerous other nonstatutory mitigators that it considered individually and cumulatively.[5] The trial court found that the aggravating circumstances outweighed the mitigating circumstances by a substantial margin and imposed the death sentence. On appeal, Morris raises five issues with regard to his conviction and sentence.[6]

II. ANALYSIS

A. EXCLUSION OF TESTIMONY
Morris argues that the trial court erred in excluding the proffered testimony of defense witness, Toni Maloney. In his opening statement, Morris told the jury that Sherry Laventure, a neighbor of the victim, would testify that on the day before the victim's body was discovered, Laventure saw a man walking around the victim's apartment looking at the windows and doors. Morris then asserted that Laventure would confirm that the man she saw was definitely not a black man, and therefore could not have been Morris. However, when Morris sought to elicit this testimony on direct examination, Laventure instead testified that the man she saw was not white. On cross-examination, the prosecutor followed up on this testimony:
Q: Were you ever told by anyone that all you have to do is come to this court room and say that the person was not black?
A: Yes.
Q: Who made that statement to you ma'am?
A: The defense side.
Q: Do you rememberdo you have a name with that person?
A: I think it was Maloney. It was a lady.
Q: Would the name Toni Maloney ring any bells?
A: Yes.
Morris did not object to this line of questioning at the time, but Morris subsequently advised the trial court that he intended to call Maloney to "rebut" the suggestion that Maloney told Laventure *666 how to testify. Morris argued that the testimony was necessary because Laventure's testimony impugned the integrity of the defense and thus infringed upon Morris's rights to a fair trial and to counsel. Morris then moved for a mistrial on these grounds. While still pursuing his motion for a mistrial, Morris stated that the problem could be solved in part by a stipulation that the defense did not encourage any witness to present false testimony. Morris, however, also renewed his request to call Maloney as a witness and subsequently proffered Maloney's testimony. The court denied the motion for mistrial and did not allow Maloney to testify, but agreed to read the following stipulation:
The parties stipulate and agree that no attorney representing the defendant, nor any representative of the public defender's office, has suggested or encouraged any witness to present false testimony.
On appeal, Morris now asserts that the stipulation was insufficient, and that the trial court abused its discretion by not admitting Maloney's testimony. Morris argues that a party cannot be required to stipulate to a material fact because "a colorless admission ... may sometimes have the effect of depriving the party of the legitimate moral force of his evidence." Charles W. Ehrhardt, Florida Evidence, § 403.1, at 159 & n. 32 (2001 ed.) (quoting 9 Wigmore, Evidence § 2691 (3d ed.1940)).
Morris's reliance on Ehrhardt is misplaced. Far from being required to stipulate that no one in the Public Defender's office encouraged any witness to present false testimony, Morris suggested the stipulation. Further, we conclude that the trial court did not abuse its discretion in precluding Maloney from testifying. The only purpose for the admission of Maloney's testimony that Morris argued below and preserved for review was to rebut the suggestion that Maloney told Laventure how to testify. However, as noted by the trial judge: "The problem, of course, is that its relevancy is tenuous at best since it doesn't get to the ultimate issue, which is cured by the stipulation." Morris did not preserve any other purpose for review because he did not assert any other purpose in arguing for the admission of Maloney's testimony. See § 924.051(1)(b), Fla. Stat (2001); Stephens v. State, 787 So.2d 747, 753 (Fla.2001).[7] Accordingly, the trial court did not abuse its discretion by excluding Maloney's testimony. Further, in light of the stipulation read to the jury, the trial court did not abuse its discretion in denying the motion for a mistrial.

B. JUROR CONTACT
Morris argues that a new trial is required due to improper juror contact with a backstruck juror turned spectator. Dorothy Sanders was initially chosen as a member of the jury. However, before the jury was sworn, Morris exercised a backstrike of Sanders. Subsequently, Sanders attended the trial as a spectator. During the penalty phase, Morris's two sisters observed Sanders conversing with jurors smoking outside the courthouse and brought this issue to Morris's attention. Morris in turn notified the trial court and requested the trial court to ask Sanders about the content of the discussions. Sanders was sworn and testified that she did talk to some of the jurors, but not about the trial. When the trial court asked if either counsel had further questions *667 Morris did not ask for any additional inquiry of either Sanders or of the jury members. Further, after Sanders was excused and the jury returned to the courtroom, the judge asked the jury members if they had anything to report about any contacts about the case. The jurors indicated that they had nothing to report.
Morris admits that actual prejudice cannot be shown on the record, but nonetheless asserts that the right of a defendant to be tried by a jury free from improper influences is a paramount right. Morris argues that a new trial is required as a matter of public policy for the purpose of maintaining confidence in the integrity of jury trials because the potential for prejudice in this circumstance was so great.
We disagree. The record affirmatively reveals no indication of potentially harmful juror misconduct. In Amazon v. State, 487 So.2d 8, 11 (Fla.1986), this Court stated: "[P]otentially harmful misconduct is presumptively prejudicial, but the defendant has the initial burden of establishing a prima facie case that the conduct is potentially prejudicial." This Court held that the defendant's showing that a juror had dinner with his fiancée did not satisfy his burden of establishing prima facie potential prejudice because the case was not discussed at the dinner. See id.
Similarly, Sanders testified that she did not talk to any jurors regarding the case, and there is no per se potential prejudice rule regarding contact between a juror and a spectator or a juror and a former juror. See Occhicone v. State, 570 So.2d 902, 904 (Fla.1990) (holding that it was not an abuse of discretion to deny a motion for mistrial on the ground that a spectator told a prospective juror during voir dire that she thought the defendant was guilty where the defendant failed to establish that the jury pool had been tainted). Accordingly, we reject Morris's claim of error.

C. HISTORY OF DRUG ABUSE MITIGATOR
Morris next argues that the trial court erred in finding that a history of drug abuse is not mitigating. In the trial court's sentencing order, under a section labeled: "The defendant began using alcohol and drugs at an early age, and developed a lifelong addiction problem," the court stated:

Established and uncontroverted. That the defendant used drugs in the past is not mitigating. Moreover, there is no evidence that he was using drugs in September, 1994 when he murdered Mrs. Livingston. This factor is entitled to little weight.

(Emphasis supplied.) In this case, the trial court found as established and uncontroverted that Morris developed a lifelong addiction to drugs and alcohol. Thus, under the facts of this case we agree with Morris that his history of drug and alcohol abuse and addiction is a valid nonstatutory mitigator, and that the defendant does not have to be under the influence of the drugs or alcohol at the time of the murder for this mitigating circumstance to be weighed. See Mahn v. State, 714 So.2d 391, 401 (Fla.1998).
Although the trial court's order on this point is confusing, it appears that the trial court did find and weigh the prior history of drug abuse and addiction. Under these circumstances, and considering all of the other aggravation and mitigation in the case that the trial court evaluated, we conclude that any inaccuracy in the trial court's statements is harmless beyond a reasonable doubt. See Barwick v. State, 660 So.2d 685, 695-96 (Fla.1995).

D. JURY INSTRUCTION FOR NONSTATUTORY MITIGATORS
Morris additionally argues that the trial court erred in refusing to instruct the *668 jury on specific nonstatutory mitigating circumstances. This Court has previously declined to mandate the requested jury instruction. Thus, we reject this claim of error. See, e.g., Shellito v. State, 701 So.2d 837, 842 (Fla.1997) (citing Finney v. State, 660 So.2d 674, 684 (Fla.1995)).

E. PROPORTIONALITY
Morris argues that the death penalty is disproportionate and that his death sentence should be reduced to life. We disagree. The function of this Court's proportionality review is to foster uniformity in death penalty law. See Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (citing Tillman v. State, 591 So.2d 167, 169 (Fla. 1991)). The analysis by which to achieve this function is to "consider the totality of circumstances in a case, and to compare it with other capital cases." Id. (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)). As we have explained:
[T]he death penalty is reserved "for the most aggravated and unmitigated of most serious crimes." Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla. 1973)). This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). "It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990).
Sexton v. State, 775 So.2d 923, 935 (Fla. 2000). Further, this Court has stated:
Proportionality review "requires a discrete analysis of the facts," Terry v. State, 668 So.2d 954, 965 (Fla.1996), entailing a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.
Urbin, 714 So.2d at 416.
In this case, the trial judge found four statutory aggravators: (1) the crime was committed while Morris was on parole from a previous felony; (2) Morris was previously convicted of a felony involving the use or threat of violence; (3) the crime was committed for financial gain; and (4) HAC. Morris does not challenge the trial court's findings relative to any of these aggravators.
Morris focuses on the mitigation that consists of the circumstances of his childhood, history of drug abuse, and organic brain damage. We acknowledge that the trial court found the "substantially impaired capacity to conform conduct to the requirements of law" statutory mitigator. However, although the trial court found that Morris "suffers from chronic brain syndrome with mixed features including frontal lobe brain damage," the trial court explained:
What is not clear from the evidence is how this condition relates to the murder. Dr. Henry Dee testified that people with this condition typically make choices against the odds, that when they commit crimes, they are unplanned and disorganized crimes. It is unusual for such patients to form bonds with others, he said. Knowing his condition, Dr. Dee would have expected a more extensive record for this defendant. The court is left with the overall impression that impulsiveness is a dominant feature. The defendant is not powerless to control his behavior, but his ability to do so may be substantially impaired. The court is reasonably convinced that this factor exists and has given it moderate weight.
*669 We conclude that the death sentence in this case, considering the totality of the circumstances, is proportionate when compared to other similar cases where the death sentence was affirmed, even in light of the substantial mitigation that the trial court found and weighed. See Hayes v. State, 581 So.2d 121, 126-27 (Fla.1991) (affirming the death penalty after the trial court found the "committed for pecuniary gain" and "committed while engaged in armed robbery" aggravators, the "age" statutory mitigator, and the "low intelligence," "developmental learning disability," and "product of a deprived environment" nonstatutory mitigators); Bowden v. State, 588 So.2d 225 (Fla.1991) (affirming the death sentence where trial court found the "previous conviction of a violent felony" and "HAC" aggravators, the "age" statutory mitigator, and the "product of a terrible childhood" nonstatutory mitigator); Hudson v. State, 538 So.2d 829, 831 n. 5 (Fla.1989) (affirming the death sentence where trial court found the "previous conviction of a violent felony" and "committed during armed burglary" aggravators, and the "being under extreme mental or emotional disturbance," "impaired capacity to conform conduct to requirements of law," and "age" statutory mitigators).

F. SUFFICIENCY OF THE EVIDENCE
Although Morris has not separately raised the issue of sufficiency of the evidence, we have an independent obligation to review the record. See Jennings v. State, 718 So.2d 144, 154 (Fla.1998). Initially we note that Morris took the stand in his own defense. Although he denied that he committed the murder, he admitted to being at the scene and to thereafter coming into possession of the items that were later identified as belonging to the victim. The evidence presented by the State included physical evidence linking Morris to the crime scene and the murder. First, from the biological fluids that were obtained from the victim's body and from the blood stain on the kitchen curtain, it was determined that the probability that the DNA was not Morris's was between 1 in 220,000 and 1 in 71 million. Second, Morris left a fingerprint on the lightbulb on the porch outside the victim's apartment. Third, Morris possessed various items taken from the victim's residence. Finally, Sastre testified that Morris admitted that he committed the murder and burglarized the home. The record in this case thus contains competent substantial evidence to support Morris's convictions.

III. CONCLUSION
For the reasons discussed above, we affirm Morris's convictions and sentence of death.
It is so ordered.
SHAW, HARDING, ANSTEAD, and PARIENTE, JJ., concur.
WELLS, C.J., concurs as to conviction, and concurs in result only as to sentence with an opinion.
LEWIS and QUINCE, JJ., concur as to conviction, and concur in result only as to sentence.
WELLS, C.J., concurring in result only.
I concur in the result in this case.
I do not agree with the opinion at page 667-668 and the citation to Mahn v. State, 714 So.2d 391, 401 (Fla.1998). I recognize that this Court's cases, including Mahn, can be read to support the opinion's statement. However, the cases cited in Mahn are cases in which heavy drug use and addiction were demonstrated to have adversely changed the person and that this should be considered in evaluating the person. *670 The issue in those cases was whether the drug and alcohol abuse was a factor in the person's background that would mitigate against imposition of the death penalty. See § 921.141(6)(h), Fla. Stat.
I disagree with the statement, as baldly set forth in this opinion, which appears to make "drug and alcohol abuse and addiction" a nonstatutory mitigating factor as a matter of law. It is simply bereft of common sense to have as a rule of law that past voluntary abuse of drugs and alcohol always benefit a person convicted of first-degree murder as mitigating against the imposition of the death sentence. But that seems not relevant to the situation in this case. Rather, what the trial court here said is indisputably correct"That the defendant used drugs in the past is not mitigating." (Emphasis added.)
NOTES
[1] Because we affirm the convictions and sentence, we do not address the State's cross-appeal.
[2] These aggravators included: (1) the crime was committed while Morris was on parole from a previous felony (moderate weight); (2) Morris was previously convicted of a felony involving the use or threat of violence (moderate weight); (3) the crime was committed for pecuniary gain (great weight); and (4) the crime was especially heinous, atrocious, or cruel ("HAC") (great weight).
[3] The statutory mitigator was "substantially impaired capacity to conform conduct to the requirements of law" (moderate weight).
[4] These nonstatutory mitigators included: (1) Morris was born to a teenaged, unmarried mother; (2) Morris was physically and emotionally abused as a child; (3) Morris suffered neglect and physical deprivation as a child; (4) Morris's mother was a drug and alcohol abuser when he was a child; (5) Morris grew up in extreme poverty; (6) Morris witnessed the physical and sexual abuse of his mother and sisters; (7) Morris's father was absent for most of Morris's life; and (8) Morris's mother was arrested and had a criminal record while he was growing up (great weight collectively).
[5] These additional nonstatutory mitigators included: (1) borderline IQ (little weight); (2) learning disabilities as a child (little weight); (3) developed ulcers at a young age, reflecting extreme stress (little weight); (4) use of alcohol and drugs at a young age and lifelong addiction problems (little weight); (5) obtained high school diploma despite obstacles (slight weight); (6) had loving protective relationships with family including his daughter (some weight); (7) adapts well to prison life (little weight); (8) can continue to support, encourage, and nurture his family while incarcerated (some weight); (9) a life sentence is sufficient (little weight); (10) courtroom demeanor was superb (some weight).
[6] Morris raises the following claims: (1) the trial court erred in excluding the proffered testimony of defense witness, Toni Maloney; (2) Morris should receive a new trial due to the improper contacts between members of the jury and a backstruck juror who attended the trial as a spectator; (3) the trial court erred in finding that Morris's history of drug abuse is not mitigating; (4) the trial court erred in refusing to instruct the jury on specific nonstatutory mitigating circumstances; and (5) the death sentence is disproportionate.
[7] In fact, when the trial judge stated that he would not allow Maloney to testify that Laventure told her the man was not black, on the ground that such testimony would be hearsay without an exception, defense counsel assured the trial court that he never intended to use Maloney for anything other than to educate the jury as to Maloney's role as a process server.