387 So.2d 333 (1980)
Dane T. GAFFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 48421.
Supreme Court of Florida.
June 12, 1980.
Rehearing Denied September 22, 1980.
*334 David J. Busch and Michael M. Corin, Asst. Public Defenders, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Patti L. Englander, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This is a direct appeal from the appellant Gafford's conviction of first degree murder. A death sentence was imposed by the trial court following a jury advisory sentence of death. We have jurisdiction.[1]
The relevant facts are as follows. Appellant, age 19, and four teenage girls, Barbara Dee Ferguson, age 15; Jennifer Denise Wright, age 14; Patty Whitmarsh, age 16; and Emmaline Long, age 17, along with the victim, James Holloway, drove in the victim's automobile from Panama City Beach to Ebro, on what Holloway led the appellant and the girls to believe was the beginning of a trip to California. After Holloway consulted with a friend regarding carrying the girls to California, he informed the appellant and the girls that they would spend the night at a deserted house in West Bay owned by Holloway's uncle and would continue the trip the next morning. Holloway's decision to delay the trip to California, combined with Barbara Dee Ferguson's desire to obtain his automobile and money, led her to plan with the other girls and the appellant to murder Holloway at the deserted house.
At the house, Barbara Dee Ferguson placed a knife underneath a couch cushion and disclosed its whereabouts to the appellant and his girl friend, Jennifer Wright. A plan was then formed to lure Holloway into a bedroom with one of the girls under the pretense of sexual intercourse. True to the plan, Holloway went into a bedroom with Barbara Dee Ferguson and Patty Whitmarsh, leaving Emmaline Long in the living room, while the appellant and his girl friend, Jennifer Wright, were in another of the bedrooms. While the parties were so located, Emmaline Long left the living room and brought to the appellant the knife which had been concealed under the couch cushion by Ferguson. The appellant insisted on having the handle of the knife covered before handling it and put on what he described as "electrical gloves" before accepting it. A few minutes later Ferguson called in a loud voice for the appellant to come and help, whereupon he went to the bedroom where he found Ferguson and Whitmarsh holding Holloway, who was naked, on his back on the bed. The victim, Holloway, was choked to death by appellant after Barbara Dee Ferguson had repeatedly kicked him in the face and Emmaline Long and the appellant had stabbed him with at least two knives. The corpse was placed in a closet following the murder, and the four girls and appellant left in the victim's car with his money.

Trial Phase
The appellant first contends that the trial court, in seating the jury in this cause, failed to abide by the dictates of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Witherspoon prohibits the exclusion of potential jurors because of a generalized objection to the infliction of the death penalty. That decision allows the exclusion of prospective jurors who state unequivocally that they cannot make an impartial decision on guilt or innocence because capital punishment might be imposed or that they would never vote for the death penalty under any circumstance. We *335 most recently applied the Witherspoon test in Magill v. Florida, 386 So.2d 1188 (Fla. 1980).
A review of the testimony of the five veniremen the appellant asserts were illegally excluded from jury service is enough to convince us that the trial judge met all Witherspoon standards.[2]
The appellant also urges that since Florida now has a system of bifurcated *336 trials in murder cases, a defendant is entitled in the guilt or innocence phase of the trial to a jury drawn from a cross-section of the community, including persons with such scruples regarding the death penalty as to render them irrevocably committed to voting against the death penalty. Appellant further asserts that such an arrangement may be accomplished by having all persons who appear for jury duty serve in the initial phase, with alternate jurors who would qualify under the Witherspoon standard to serve with them or in their stead during the second or penalty phase of the trial. We rejected this novel approach in Riley v. State, 366 So.2d 19 (Fla. 1978), and reaffirm that holding.
The indictment alleges that the appellant did "with a premeditated design" effect the death of James L. Holloway or while in the perpetration of or in an attempt to perpetrate a robbery did kill James L. Holloway, which effectively charges both first-degree murder by premeditation and by felony murder, the felony being robbery. The appellant contends that the evidence is insufficient as to the latter felony murder theory of prosecution and, therefore, he urges he is entitled to a new trial on the premeditation theory alone. We reject this contention. We find there is sufficient evidence to support a verdict of guilty of murder from a finding of premeditated design and for murder committed in the perpetration of a felony. Premeditation is established by the record which reflects the decision to kill Holloway was formed before the group reached the abandoned house, the appellant would not touch the knife until he put on gloves, and, upon call, he immediately entered the room and began strangling the victim. Support for a finding of felony murder is found in the appellant's statement wherein he said:
She [Barbara Dee Ferguson] said the reason was that he lied to us and the only thing that he wanted was just a piece of ass, and wanted his car and get what money he had. I still don't know how much money he had, that they got off him. I had about two or three dollars.
Significantly, immediately following the murder the appellant and the girls did precisely what they had set out to do, that is, they took the victim's money and his car. Additionally, the appellant's reliance on *337 Long v. State, 92 So.2d 259 (Fla. 1957), regarding charges brought conjunctively and disjunctively, is misplaced. It is inapplicable to the case at bar, and this argument has been previously rejected by the courts of this state. See Larry v. State, 104 So.2d 352 (Fla. 1958); Hargrett v. State, 255 So.2d 298 (Fla. 3d DCA 1971); Barton v. State, 193 So.2d 618 (Fla. 2d DCA 1966), cert. denied, 201 So.2d 459 (Fla. 1967). We find no reversible error in the record and affirm the conviction.

Sentencing Phase
Our final responsibility in this case is to review the imposition of the death sentence. In imposing the death sentence, the trial judge found the following aggravating circumstances to exist under the provisions of section 921.141, Florida Statutes:
1. The capital felony was committed while the Defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, the offense of robbery.
2. The capital felony was committed for pecuniary gain.
3. The capital felony was especially heinous, atrocious, or cruel... .
The trial judge also found the following mitigating circumstances to exist:
1. The Defendant has no significant history of prior criminal activity... .
2. The age of the Defendant [nineteen years] at the time of the crime... .
In imposing the death sentence, the trial judge did not have the benefit of our subsequent decisions in Gibson v. State, 351 So.2d 948 (Fla. 1977), cert. denied, 435 U.S. 1004, 98 S.Ct. 1660, 56 L.Ed.2d 93 (1978), and Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). In Provence we expressed our concern about the problem of doubling up of aggravating factors under the circumstances of a robbery murder, saying:
Consequently, one who commits a capital crime in the course of a robbery will always begin with two aggravating circumstances against him while those who commit such a crime in the course of any other enumerated felony will not be similarly disadvantaged. Mindful that our decision in death penalty cases must result from more than a simple summing of aggravating and mitigating circumstances, State v. Dixon, 283 So.2d 1, 10 (Fla. 1973), we believe that Provence's pecuniary motive at the time of the murder constitutes only one factor which we must consider in this case.
337 So.2d at 786. In Brown v. State, 381 So.2d 690 (Fla. 1980), and Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979), we recognized that such a doubling up of aggravating circumstances does not always require resentencing by the trial judge. We find, however, that in the instant case the doubling up of the aggravating factors coupled with the fact that the trial court found two mitigating circumstances requires us to remand under the doctrine we expressed in Provence and Gibson.
Subsequent to the initial imposition of the death sentence in this case, one of the appellant's accomplices received immunity, one was found guilty of second-degree murder, and the other two were allowed to plead guilty to manslaughter. Upon remand, this case will be in the same posture as it would have been if the trial court had not yet imposed sentence after the jury's recommendation. Depending upon the circumstances of a particular case, the sentence of an accomplice may affect the imposition of a death sentence. Salvatore v. State, 366 So.2d 745 (Fla. 1978); Smith v. State, 365 So.2d 704 (Fla. 1978); Slater v. State, 316 So.2d 539 (Fla. 1975). Therefore, in the resentencing proceeding, the trial court may appropriately consider the sentence of the appellant's accomplices.
For the reasons expressed, we remand this case to the trial court for a new sentencing proceeding before the trial judge, without the necessity of receiving a new jury advisory sentence.
In conclusion, we affirm the conviction and remand for resentencing.
It is so ordered.
*338 ENGLAND, C.J., and ADKINS, BOYD, OVERTON, SUNDBERG and ALDERMAN, JJ., concur.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] As to juror Grady, the following discussion occurred:

THE COURT: Well, the question is whether or not you presently hold such beliefs that under no circumstances could you vote for the infliction of the death penalty. If you know that you would not, then of course your answer would be that you know that you would not.
JUROR GRADY: I guess I know I would not.
THE COURT: You know that you would not. In other words, you hold such beliefs of regardless of for what reason, philosophically or religious belief or what have you, but you know that under no circumstances could you vote for the infliction of the death penalty. Is that correct?
JUROR GRADY: If there has to be a cut and dried answer, yes, sir, that's correct.
THE COURT: All right, I believe that would be sufficient for disqualification. Mr. Grady, you will be excused also. Defendant has objected, let the record show.
As to juror Jernigan, the following discussion occurred:
MR. NABORS: You would be hesitant to impose the death penalty.
JUROR JERNIGAN: Yes.
MR. NABORS: Your Honor, I object to the motion to remove her for cause as we clarified her answers to the extent that she qualifies to sit.
THE COURT: Mr. Jones, do you have any other questions?
MR. JONES: Let me ask you one question. And you're the only one who can be fair to your God and your conscience. Isn't it true that you could not vote the death penalty for this young man seated here?
JUROR JERNIGAN: Yes, sir, and I really don't know  I haven't kept up with it in the newspaper and I don't know that much about it.
MR. JONES: So what you're telling Judge Smith is the best you can search your conscience right now is you would not vote for the death penalty on this 19-year-old boy.
JUROR JERNIGAN: No, I could not do it.
MR. JONES: Renew our challenge.
THE COURT: The challenge for cause will be granted.
As to juror Chrismer, the following discussion occurred:
MR. JONES: Mr. Chrismer, I've asked the other new jurors and I think I just will ask you the question first. Do you believe in the death penalty?
JUROR WOODROW E. CHRISMER: No, sir, I do not.
MR. JONES: Under no circumstances would you vote for the death penalty?
JUROR CHRISMER: No, sir, I wouldn't.
MR. JONES: Court please, State challenges Mr. Chrismer for cause.
THE COURT: Any questions, Mr. Nabors?
MR. NABORS: Yes, sir. Notwithstanding your opposition to the death penalty, Mr. Chrismer, do you know of any reason whatsoever why you could not sit in judgment of the defendant with respect to the guilt or innocence of the crime charged?
JUROR CHRISMER: No.
MR. NABORS: Well, I object to him being stricken for cause, Your Honor. I think I've made my objection clear.
THE COURT: Mr. Chrismer, it appeared to me from the questions that were asked by Mr. Jones and your answers that under no circumstances would you vote for the infliction of the death penalty. Is that your attitude and belief?
JUROR CHRISMER: That's right, sir.
As to juror Johnson, the following discussion occurred:
MR. JONES: In other words, under no circumstances could you vote guilty in this case knowing that the defendant might receive the electric chair.
JUROR ... JOHNSON: Mr. Jones, I'm an R.N. and I've spent 30 years saving lives. I don't believe I could do it.
* * * * * *
MR. NABORS: Can you conceive of a circumstance under which you would invoke the death penalty?
JUROR ... JOHNSON: I don't believe I could.
MR. NABORS: But you're confident that you are able to sit in judgment on Dane Gafford with respect to his innocence or guilt.
JUROR ... JOHNSON: Yes, sir.
MR. NABORS: I object to her removal for cause.
THE COURT: Mrs. Johnson, could you render a fair and impartial verdict on guilt or innocence of the defendant with knowledge that a verdict of guilty might result in the infliction of the death penalty?
JUROR ... JOHNSON: If that was the only choice, I couldn't.
THE COURT: I'm sorry, I didn't understand you.
JUROR ... JOHNSON: I said if that were the only choice, I could not.
THE COURT: If that were the only choice.
JUROR ... JOHNSON: Yes.
THE COURT: Well, of course I think the way the question is framed it wouldn't be the only choice. It would be a choice. Would your beliefs in regard to the death penalty be such that it would influence or would likely influence your verdict on guilt or innocence?
JUROR ... JOHNSON: I believe it would.
THE COURT: You believe that it would.
JUROR ... JOHNSON: Yes.
THE COURT: All right. Challenge  excuse me.
MR. NABORS: Mrs. Johnson, did you understand the supplementary instruction from the bench, that is that we may or may not become involved with the bifurcated trial, that the first aspect of trial will be to determine the guilt or innocence of Dane Gafford.
JUROR ... JOHNSON: Yes.
MR. NABORS: If you should determine beyond and to the exclusion of a reasonable doubt that Dane was guilty of the crime, you would then set to recommend either the death penalty or mercy. I understand you have a preconceived notion against the death penalty, but that notion would not carry over, Mrs. Johnson, through the first aspect of the trial. You would be able to sit as a fair and impartial juror and weigh the evidence which comes from the stand fairly and impartially with respect to the question of guilt or innocence. Even though you oppose the death penalty you would be able to handle the first aspect of the trial.
JUROR ... JOHNSON: Yes.
MR. NABORS: And notwithstanding your objections to the death penalty, you would be able to sit and weigh the evidence and return a verdict, either guilty or not guilty.
JUROR ... JOHNSON: Yes.
As to juror Jones, the following discussion occurred:
MR. NABORS: Second question: Is there any reason whatsoever that you know of why you could not be a fair and impartial juror with respect to whether or not the defendant is guilty or innocent of the crime as charged apart from the second aspect perhaps of the trial?
JUROR JONES: No.
MR. NABORS: Is it your answer that you could sit fairly with respect to his guilt or innocence?
JUROR JONES: Yes.
MR. JONES: One more question, Your Honor. Mrs. Jones, we're only trying to be fair and I don't want to try to trick you, but could you vote guilty knowing that there was a possibility the man would get the death penalty regardless of whether you wanted it or not?
JUROR JONES: I could not.
MR. JONES: Thank you. That's the answer.