830 So.2d 56 (2002)
Richard Earl SHERE, Jr., Petitioner,
v.
Michael W. MOORE, etc., Respondent.
No. SC00-1960.
Supreme Court of Florida.
September 12, 2002.
Rehearing Denied October 28, 2002.
*57 Bill Jennings, Capital Collateral Regional Counsel-Middle, Robert T. Strain, Assistant CCRC, April E. Haughey, Assistant CCRC, and Elizabeth A. Williams, Staff Attorney, Tampa, FL, for Petitioner.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Respondent.
PER CURIAM.
Richard Earl Shere petitions this Court for writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(9), Fla. Const. For the reasons stated below, we deny his petition for habeas relief.

PROCEDURAL BACKGROUND
Shere and Bruce Demo were charged with the murder of Drew Snyder, and in April 1989, Shere was convicted of first-degree murder. The jury recommended a sentence of death by a vote of seven to five. Upon submission of memoranda by the parties and a Spencer[1] hearing, the trial court sentenced Shere to death. In the meantime, and before Shere was sentenced, Demo was convicted of second-degree murder and sentenced to life imprisonment. Shere's counsel unsuccessfully urged the trial court to consider Demo's life sentence as a reason to sentence Shere to life.[2] Shere's conviction and death sentence were affirmed on direct appeal without reference to Demo's sentence. See Shere v. State, 579 So.2d 86 (Fla.1991). This Court did not discuss the proportionality of Shere's sentence in its opinion. However, of the three aggravators found by the trial court, this Court struck the heinous, atrocious, and cruel (HAC) aggravator, and sustained the cold, calculated, and premeditated aggravator (CCP) and the aggravator concerning hindrance of law enforcement. See id. at 95-96.
In 1993 and 1997, pursuant to Florida Rule of Criminal Procedure 3.850, Shere filed a number of claims for postconviction relief. Subsequent to an evidentiary hearing on one of the claims, the trial court denied Shere's claims. In 1999, the trial court's denial of relief was affirmed by this Court. See Shere v. State, 742 So.2d 215 (Fla.1999). Shere now files this petition *58 for habeas corpus relief, alleging several claims of ineffectiveness of appellate counsel in his initial appeal.

BACKGROUND
As described by this Court on direct appeal, the circumstances of this crime were established at trial:
The victim, Drew Snyder, was reported missing in December 1987, and the ensuing investigation led to Shere, whom police contacted three weeks after Snyder's disappearance. Shere waived his Miranda rights, made a series of statements, and led detectives to various scenes involved in the murder.
According to those statements, Shere said Bruce "Brewster" Demo told him on December 24 that Snyder was going to inform the police about Demo's and Snyder's theft of some air conditioners. Demo also advised Shere that Snyder was a "big mouth" who "had ratted out" on Shere as well. Shortly after midnight on the morning of December 25, Shere received a telephone call from Demo advising him that Demo was thinking about killing Snyder, and Demo threatened to kill Shere if he did not help. Shere then went to Demo's house where Demo loaded a shovel into Shere's car. They smoked marijuana, drank beer, went to Snyder's house at about 2:30-3:00 a.m., and talked Snyder into going rabbit hunting.
At some point during the hunt in the early morning hours, Shere placed his.22-caliber pump action rifle on the roof of the car so he could relieve himself. Suddenly, Shere said, Demo grabbed the rifle, and Shere heard the weapon discharge. Shere dropped to the ground and heard Snyder say, "Oh, my God, Brewster," followed by several more shots. When the shooting stopped, Shere got up and saw Snyder, still breathing, lying on the back seat of the car. Shere said he wanted to take Snyder to the hospital, but Demo took out his own gun, a .22-caliber pistol, and shot Snyder in the forehead, pulled him out of the car, and shot Snyder again in the chest. After the last shot was fired, they loaded Snyder's body into the trunk and drove to a nearby location where Shere said Demo made him dig a hole and bury the body. Then Shere took Demo home, drove to his own house, cleaned up, and burned the bloodied back seat of his car in the back yard.
At Demo's suggestion, Shere said, he and his girlfriend, Heidi Greulich, went to Snyder's house later that day, gathered some of Snyder's belongings, then drove to Clearwater to dump the belongings, hoping to leave the impression that Snyder had suddenly left town. Shere also said he traded the .22-caliber rifle after the murder. Detectives recovered the rifle and Shere identified it as one of the weapons used to shoot Snyder
Contradicting Shere's account, Demo made a statement to detectives in which he accused Shere of firing the first shots. Detective Alan Arick testified in the defendant's case without objection that Demo said he turned his back to the car to relieve himself when he heard a shot. He turned and saw Shere pointing the rifle at Snyder, then Shere fired at Snyder five or six times through the car's window. Demo said Shere pointed the gun at him and told him to finish off Snyder, Arick testified. Demo said he fired the pistol two times into Snyder's head and one time to the heart, including "the fatal shot." Demo told Arick he made Shere dig the grave because he was upset by what Shere had done to Snyder.
Greulich testified as a court witness about a statement she made to detectives *59 in January 1988. In her statement she told detectives that she overheard Shere's end of the telephone conversation with Demo in the early hours of December 25. Shere reportedly said to Demo "I can't believe Drew would turn state's evidence against me." When Shere returned home on the morning of December 25, Greulich told detectives, she saw blood on Shere's jeans and on the back seat of Shere's car. Greulich testified that Shere told her he alone killed Snyder, but he said that only to protect her, because "[i]f I knew Brewster was out there, Brewster would have hurt me."
Shere's friend, Ray Pruden, testified that one night after Christmas Shere told him he shot Snyder to death while out rabbit hunting. He said he shot him ten or fifteen times, then buried the body. Shere did not say that Demo was involved, Pruden testified.
Medical testimony established that Snyder was shot to death with ten gunshots. Three shots were fired into his head, one shot was fired through the chest, and other shots were fired into the back, the buttocks, the right thigh, and the right forearm. Death could have been caused by gunshot wounds to the head or chest. The medical examiner testified that any of the shots could have caused pain had Snyder been conscious, but there was no evidence that Snyder was conscious.
Seven projectiles were removed from the body during the autopsy. Ballistics evidence showed that shots fired into Snyder's head came from the pistol, one bullet recovered from Snyder's leg was fired from the rifle, and others could not be clearly identified. Other forensic evidence established that shots had been fired in Shere's car, that human blood was found on Shere's boots, and that a hair from Snyder was found on Shere's jacket.
The jury found Shere guilty and recommended the sentence of death by a vote of seven to five.
Shere, 579 So.2d at 88-89 (footnotes omitted).

HABEAS CLAIMS
In this petition, Shere argues appellate counsel was ineffective for failing to raise the following issues on appeal: (1) whether the State's improper remarks and biblical references during the penalty phase rendered Shere's death sentence unreliable and in violation of his constitutional rights; (2) whether Shere's death sentence was disproportionate, especially when considered in conjunction with the life sentence received by the codefendant, Demo; and (3) whether the trial court failed to find the statutory mitigator of no significant prior criminal history. Shere also asserts that his constitutional right to be free of cruel and unusual punishment will be violated if he is executed as he is incompetent and hence ineligible for execution.

ANALYSIS
Initially, we have thoroughly reviewed three of Shere's claims and find them to be without merit. As to Shere's first claim, we find no ineffectiveness of appellate counsel in the failure to claim error in the prosecution's use of religious references during the penalty phase. The record reflects not only the defense's failure to object in many instances, but also that the defense itself interjected the issue of religious belief into the proceedings. While we have cautioned against such practice, we find no deficiency by appellate counsel here in light of the record. In his third claim, Shere argues that the trial court improperly failed to find the mitigating circumstance of "no significant prior *60 criminal history." The record reflects, however, that the trial court properly found that Shere's own admission of prior criminal behavior negated a finding of this mitigating circumstance. As to Shere's claim that he may be incompetent at the time of execution, Shere admits this issue is not ripe for state court proceedings, but is raised solely to prevent a bar for potential federal habeas relief.
We also find Shere's second claim to be without merit but warranting discussion. Shere claims that although his codefendant, Demo, was tried separately and sentenced to life imprisonment before the trial court sentenced Shere, appellate counsel failed to raise Demo's lesser sentence and the proportionality of Shere's death sentence on direct appeal.[3] Shere claims that although the trial court was aware of Demo's life sentence, the trial court did not consider it in mitigation of Shere's sentence, and Shere's jury was never informed of Demo's life sentence. Shere further contends that under this Court's case law, Shere was entitled to have his sentence reduced to life because Demo was the instigator of the murder and was at least equally, if not more, culpable in the killing. Shere asserts that counsel's failure to raise this issue on direct appeal constitutes ineffective assistance of appellate counsel.
This Court has established specific criteria for considering claims of ineffective assistance of appellate counsel:
The criteria for proving ineffective assistance of appellate counsel parallel the Strickland standard for ineffective trial counsel: Petitioner must show 1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and 2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result. Johnson v. Wainwright, 463 So.2d 207 (Fla.1985).
Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985). We apply that standard here and conclude, as more fully explained below, that appellate counsel was not ineffective for failing to raise this issue on direct appeal because Demo's culpability for the murder had been determined to be less than Shere's culpability for the murder.
This Court has an independent obligation to review each case where a sentence of death is imposed to determine whether death is the appropriate punishment. See Morton v. State, 789 So.2d 324, 335 (Fla.2001). As we have stated, "The death penalty is reserved for `the most aggravated and unmitigated of most serious crimes.'" Clark v. State, 609 So.2d 513, 516 (Fla.1992) (quoting State v. Dixon, 283 So.2d 1, 7 (Fla.1973)). In deciding whether death is a proportionate penalty, the Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998). However, in cases where more than one defendant was involved in the commission of the crime, this Court performs an additional analysis of relative culpability. Underlying our relative culpability analysis is the principle that equally culpable co-defendants should be treated alike in capital sentencing and receive equal punishment. See Ray v. State, 755 So.2d 604, 611 (Fla. 2000). See also Jennings v. State, 718 So.2d 144, 153 (Fla.1998) ("While the death penalty is disproportionate where a less *61 culpable defendant receives death and a more culpable defendant receives life, disparate treatment of codefendants is permissible in situations where a particular defendant is more culpable.") (citation omitted).
In this case, however, we cannot conduct a true relative culpability analysis because the codefendant was convicted of second-degree murder. We cannot make a true comparison of a first-degree murder conviction and a second-degree murder conviction. See Steinhorst v. Singletary, 638 So.2d 33 (Fla.1994) (because Hughes, the codefendant, was convicted of second-degree murder, his sentence of life imprisonment was not relevant to a claim of disparate sentencing). A conviction of first-degree murder requires a finding by either a jury or the judge that the defendant committed a murder with premeditation or during the course of a felony enumerated in section 782.04(1)(a)2, Florida Statutes (1987). When a defendant is convicted of second-degree murder, either a jury or the judge has determined that the defendant committed a murder by doing an act that was imminently dangerous to another and evincing a depraved mind regardless of human life, without any premeditated design, or that the murder was committed during the course of a felony by a person who was not engaged in the perpetration of that felony. See § 782.04(2)-(3), Fla. Stat. (1987). In other words, a conviction of second-degree murder means the defendant did not form the necessary intent to commit first-degree murder and did not commit the murder during the perpetration or attempt to perpetrate drug trafficking, arson, sexual battery, robbery, burglary, kidnapping, escape, aggravated child abuse, aggravated abuse of the elderly or disabled, aircraft piracy, carjacking, home invasion robbery, aggravated stalking, murder of another human, or unlawful throwing, placing or discharging of a destructive device or bomb. Because Shere's codefendant was convicted of second-degree murder, his relative culpability[4] for this murder has already been determined to be less than Shere's culpability.
This situation is not unlike the one we addressed in Larzelere v. State, 676 So.2d 394 (Fla.1996). In Larzelere, we found a sentence of death proportional where the codefendant was acquitted. In so finding, we noted "that Jason's acquittal is irrelevant to this proportionality review because, as a matter of law, he was exonerated of any culpability." Id. at 407. Similarly, in this case a separate jury has determined Shere's codefendant to be less culpable, evidenced by his conviction for second-degree murder.
On the other hand, equally culpable connotes the same degree of blame or fault. In order to have that same degree of blame or fault the codefendants must, at a minimum, be convicted of the same degree of the crime; third-degree murder does not connote the same degree of blame or fault as second-degree murder, which does *62 not connote the same degree of blame or fault as first-degree murder. It is the crime for which the defendant is convicted that determines his or her culpability, and in this case that decision has been made by the trier of fact.
Under section 921.141, Florida Statutes (1987), a defendant is eligible for a sentence of death only if he or she is convicted of a capital felony. This Court has defined a capital felony to be one where the maximum possible punishment is death. See Rusaw v. State, 451 So.2d 469 (Fla.1984). The only such crime in the State of Florida is first-degree murder, premeditated or felony. See State v. Boatwright, 559 So.2d 210 (Fla.1990); Rowe v. State, 417 So.2d 981 (Fla.1982).[5] Only in situations where the defendant's blameworthiness for the murder reaches the first-degree level do we proceed to the next step in determining if the circumstances warrant the punishment of death.
Therefore, once a codefendant's culpability has been determined by a jury verdict or a judge's finding of guilt we should abide by that decision, and only when the codefendant has been found guilty of the same degree of murder should the relative culpability aspect of proportionality come into play. Moreover, the codefendant should not only be convicted of the same crime but should also be otherwise eligible to receive a death sentence, i.e., be of the requisite age and not mentally retarded.[6]
We have decided numerous cases where we have addressed the proportionality of defendants' death sentences based on the argument that an equally culpable codefendant received a lesser sentence.[7] However, in only ten of those cases did the proportionality analysis involve codefendants who received immunity or codefendants whose lesser sentences were based on convictions for second-degree murder or third-degree murder.[8]See Howell v. State, 707 So.2d 674 (Fla.1998) (codefendant pled to second-degree murder and received a sentence of forty years); Cardona v. State, 641 So.2d 361 (Fla.1994) (codefendant pled guilty to second-degree murder and testified against the defendant); Mordenti v. State, 630 So.2d 1080 (Fla. 1994) (codefendant received immunity for *63 her testimony);[9]Cook v. State, 581 So.2d 141 (Fla.1991) (codefendants pled guilty to second-degree murder and received sentences of twenty-three and twenty-four years); Hayes v. State, 581 So.2d 121 (Fla. 1991) (codefendant pled guilty to second-degree murder and testified against the defendant); Downs v. State, 572 So.2d 895 (Fla.1990) (codefendant testified against the defendant under a grant of immunity); Brown v. State, 473 So.2d 1260 (Fla.1985) (codefendant pled to second-degree murder); White v. State, 415 So.2d 719 (Fla. 1982) (codefendant convicted of third-degree murder); Tafero v. State, 403 So.2d 355 (Fla.1981) (codefendant received a life sentence after pleading to second-degree murder); Salvatore v. State, 366 So.2d 745 (Fla.1978) (codefendant received a ten year sentence after pleading to second-degree murder). In none of these cases did we find the sentence of death disproportional because the codefendant received a lesser sentence or no punishment at all.
Even if appellate counsel should have made an argument concerning the codefendant's sentence and relative culpability, appellate counsel cannot be ineffective because the codefendant's culpability for this murder has been determined to be less than Shere's, and thus there is no prejudice in failing to raise the issue. For the reasons expressed, we deny the petition for writ of habeas corpus.
It is so ordered.
SHAW, WELLS, LEWIS, and QUINCE, JJ., and HARDING, Senior Justice, concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
ANSTEAD, C.J., concurring in part and dissenting in part.
I cannot agree with the majority's analysis and disposition of Shere's claim wherein he alleges that his codefendant's life sentence should have been an important factor in assessing Shere's sentence and should have been argued by his counsel on appeal. I am especially concerned about the effect of the majority's holding on our established law that the sentence received by a codefendant must be considered in determining an appropriate sentence.
Shere was individually tried before a jury in April of 1989, while his codefendant, Demo, was tried separately, and sentenced to life imprisonment, after Shere had been tried and convicted, but before Shere was sentenced. Shere asserts that although the trial court was aware of Demo's life sentence, the trial court erroneously failed to consider it as a mitigating circumstance, and Shere's jury was never informed of the codefendant's life sentence. Even without knowledge of his codefendant's sentence, Shere's jury recommended a death sentence by a vote of seven to five, only one vote short of a life recommendation.
Shere now claims that although the record reflects that his codefendant Demo was tried and sentenced to life before the trial court sentenced Shere, appellate counsel failed to raise his codefendant's lesser sentence and its effect on the proportionality of Shere's death sentence on direct appeal. Shere further contends that under this Court's case law, he was entitled to have his sentence reduced to life because codefendant Demo instigated the *64 murder and was at least equally, if not more, culpable in the killing. Because the issue of Demo's lesser sentence was raised below and thereby preserved for appeal, Shere asserts, counsel's failure to raise this on direct appeal constitutes ineffective assistance of appellate counsel.

LAW
Due to the uniqueness and the finality of death, this Court addresses the propriety of all death sentences in a proportionality review upon appeal. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In conducting this review, this Court considers the totality of all the circumstances in a case as compared to other cases in which the death penalty has been imposed, see Robinson v. State, 761 So.2d 269 (Fla. 1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1563, 146 L.Ed.2d 466 (2000), thereby providing for uniformity in the application of this sentence. As a corollary to this analysis of comparing the circumstances of a case in which death had been imposed to others with a similar sentence, the Court also performs an additional analysis of relative culpability in cases where more than one defendant was involved in the commission of the killing.
While the first analysis focuses on the larger universe of death sentences that have been imposed, the latter analysis homes in on the smaller universe of the perpetrators and participants in a given capital murder. We explained the principle in Slater v. State, 316 So.2d 539, 542 (Fla.1975), when we declared: "We pride ourselves in a system of justice that requires equality before the law. Defendants should not be treated differently upon the same or similar facts." More recently, in Ray v. State, 755 So.2d 604, 611 (Fla.2000), this Court again emphasized and reaffirmed the principle that equally culpable codefendants should be treated alike in capital sentencing. In Ray, for instance, this Court pointed out:
The record in this case reflects the possibility that Hall [codefendant] was the shooter. Hall was injured during the shootout with Lindsey, and the placement of the wounds suggests that Hall was facing Lindsey with his arm raised in a shooting position. At a minimum, Ray and Hall are equally culpable. Both men actively participated in planning the robbery, in executing the robbery, and in stealing the car. During their escape from the robbery, they stopped to attend to a mechanical problem with the getaway vehicle, and a gun battle with Lindsey ensued. Forensic evidence shows gun residue on Ray's hands, injuries to Hall from Lindsey's gun, and Hall's blood on the murder weapon. After Lindsey was killed, both men continued their flight until they were apprehended.
Much of the evidence points to Hall as the dominant player in the crimes. It is undisputed that Hall did nearly all the talking during the robbery and appeared to be in command of the operation. In addition, only Hall had shotgun injuries caused by the officer. Finally, Hall's statements and questions to paramedics suggest that he was responsible for shooting the officer. During sentencing the State argued that although Hall instigated the gun battle, both Hall and Ray shot Lindsey. The State sought the death penalty for both. The trial judge's own remarks in sentencing Hall reflect that, at a minimum, he believed Ray and Hall to be equally culpable in the shooting. It seems clear that the judge would have imposed equal sentences but for his belief that a failure to abide by the jury's recommendation would result in a reversal on appeal. Under these circumstances, the trial *65 court's entry of disparate sentences was error.
Ray, 755 So.2d at 611-12 (emphasis added).
Ray and Slater are two of numerous cases, going back some twenty-five years, in which this Court has acknowledged the principle that the relative culpability and punishment of a codefendant is an important factor to be considered in considering a capital defendant's sentence. See, e.g., McDonald v. State, 743 So.2d 501 (Fla. 1999); Fernandez v. State, 730 So.2d 277 (Fla.1999); Jennings v. State, 718 So.2d 144 (Fla.1998); Howell v. State, 707 So.2d 674 (Fla.1998); Gordon v. State, 704 So.2d 107 (Fla.1997); Puccio v. State, 701 So.2d 858 (Fla.1997); Raleigh v. State, 705 So.2d 1324 (Fla.1997); Cole v. State, 701 So.2d 845 (Fla.1997); Slater v. State, 316 So.2d 539 (Fla.1975). In fact, there are at least seventy published opinions in which this Court has referred to this sentencing principle.[10] Invariably, these cases fall into two basic categories in which the Court has either (1) reversed the death sentence of the defendant or granted resentencing because a codefendant who received the lesser sentence was in fact equally or more culpable; or (2) affirmed the death sentence of the defendant or denied relief because the codefendant was found less culpable.[11] This Court has adhered to this *66 principle even when a codefendant is sentenced to life well after the defendant has been convicted and sentenced to death.
In Scott v. Dugger, 604 So.2d 465 (Fla. 1992), this Court considered the propriety of disparate sentences for equally culpable codefendants where the codefendant was sentenced to life subsequent to the imposition of the death sentence on the defendant, and while the defendant's sentence was pending review in this Court. In vacating Scott's sentence of death, this Court found that the "record in this case shows that Scott and [his codefendant] had similar criminal records, were about the same age, had comparable low IQs, and were equally culpable participants in the crime." Id. at 468. This Court found especially significant the trial court's remarks that "there is little to separate out the joint conduct of the codefendants which culminated in the death of the decedent." Id. Because of the codefendant's later sentence of life, this Court found that Scott's sentence was disproportionate, and accordingly vacated his sentence of death.
This Court has applied this same analysis in case after case. See, e.g., Fernandez, 730 So.2d at 283 ("The record reveals and we find that appellant's degree of participation in the crime was similar to that of codefendant Abreu, a getaway driver who received a life sentence after a plea negotiation."); Puccio, 701 So.2d at 863) ("[W]e find that Puccio's sentence of death is disproportionate when compared to the sentences of the other equally culpable participants in this crime."); Hazen, 700 So.2d at 1211-12 (holding that defendant nontriggerman accomplice to murder could not be sentenced to death when more culpable nontriggerman accomplice received sentence of life imprisonment.); Curtis, 685 So.2d at 1237 (reversing death sentence where "the actual killer was sentenced to life"); Slater, 316 So.2d at 542 (reversing death sentence where "the court that tried the appellant also permitted *67 the the `triggerman' ... to enter a plea of nolo contendere").

THIS CASE
Based on the foregoing analysis, I would find appellate counsel's failure to raise a proportionality claim on direct appeal, and particularly to assert such a claim as it relates to Demo's comparative culpability, to have been ineffective as a specific omission outside the range of professionally acceptable performance. See Wilson v. Wainwright, 474 So.2d 1162, 1164 (Fla. 1985). In Wilson, this Court emphasized counsel's special responsibility in capital cases:
The propriety of the death penalty is in every case an issue requiring the closest scrutiny. Any appellate counsel who, after being ordered to address the issue, responds with such inadequate, unpartisan brief has failed to grasp the vital importance of his role as a champion of his client's cause. We do not approve of counsel urging frivolous claims, nor do we require that every colorable claim, regardless of relative merit, be raised on appeal. However, the basic requirement of due process in our adversarial legal system is that a defendant be represented in court, at every level, by an advocate who represents his client zealously within the bounds of the law. Every attorney in Florida has taken an oath to do so and we will not lightly forgive a breach of this professional duty in any case; in a case involving the death penalty it is the very foundation of justice.
Id. Proportionality is an issue that should be raised in every death penalty case. In fact, when it is not raised by counsel, this Court will often discuss the issue on its own.
Further, as noted above, case law from this Court has long established, well before the initial appeal in this case, that the comparative culpability of a codefendant who received the lesser sentence is an important factor bearing on a defendant's sentence. Under that case law, appellate counsel had a clear responsibility to argue proportionality and to bring to this Court's attention the life sentence imposed on the codefendant Demo. The record clearly reflects that trial counsel had asked the trial court to consider Demo's sentence in determining Shere's sentence.[12] Because the issue was raised below, and because it was important, appellate counsel had the responsibility to keep the issue alive on appeal.

PREJUDICE
Of course we must also consider the merits of Shere's claim in order to determine whether he was actually prejudiced by appellate counsel's omission to argue proportionality, especially as to Demo's life sentence. If the record reflected that Demo played a minor role in the crime, a disparate sentence would be justified. However, the record reflects substantial evidence that Demo was at least as culpable as Shere, and therefore that appellate counsel's failure to consider Demo's lesser punishment as a mitigator did prejudice Shere in the sentencing calculations and proportionality review.
*68 Indeed, it appears that Demo initiated the idea and formed the plan to kill the victim and that he participated equally with Shere in carrying it out. His conduct included forcing Shere at gunpoint to bury the body. From the record, it is clear that both Shere and Demo shared the motive to commit this murder and both of them went out that night to kill the victim. The trial court found as much in its analysis of the avoid arrest aggravator in its sentencing order when it stated, "While on pretrial release in a pending case, Richard Shere agreed with another defendant, Bruce Demo, to pick up Drew and `make sure he doesn't say anything' in response to information from Bruce Demo that Drew had `ratted them out' on another charge by giving state's evidence."[13] This Court, too, emphasized the role of both defendants throughout our opinion affirming Shere's conviction. See Shere v. State, 579 So.2d 86 (Fla.1991). In particular, in rejecting the trial court's finding of the heinous, atrocious, and cruel (HAC) aggravator, we declared:
The evidence does not rise to that level in this case. The record shows that Snyder had no way of knowing before the first shot was fired that Demo and Shere took him hunting to murder him, so there was no prolonged apprehension of death. Without warning, either Shere or Demo or both fired a rapid succession of gunshots at Snyder from close range with two weapons. The killing took place quickly, and there is no evidence that Snyder experienced *69 pain or prolonged suffering. There is no evidence that he remained conscious throughout the shooting, and the first shot could have struck his head. Likewise, there is no evidence to suggest that Shere desired to inflict a high degree of pain. Four of the wounds were potentially fatal, which is an indication that they tried to kill him, not torture him. There was no testimony that any of the wounds were defensive in nature. Moreover, the fact that multiple gunshot wounds were inflicted is not, by itself, sufficient to support a finding of heinous, atrocious, or cruel. Thus, there is insufficient evidence in this record to conclude that this aggravating circumstance was proved beyond a reasonable doubt.
Id. at 96 (emphasis added).
In addition, and perhaps of critical importance, is the fact that the only aggravating circumstances this Court relied upon to approve Shere's sentence were circumstances that applied with equal force to both Demo and Shere. See id. at 95-96. Those circumstances were premised on the fact that both Demo and Shere planned to kill and killed the victim because they believed the victim was a witness to their participation in another crime:
Shere's last claim attacks the trial court's penalty-phase instructions and findings. Initially, Shere argues that the court erred by instructing the jury to consider whether the murder was committed to disrupt or hinder the lawful exercise of a governmental function or law enforcement. See § 921.141(5)(g), Fla. Stat. (1987). We disagree. Substantial competent evidence properly introduced at trial supports beyond a reasonable doubt the finding that Shere and Demo plotted to kill Snyder because they believed Snyder had become a witness against them in an unrelated criminal case. See, e.g., Francis v. State, 473 So.2d 672, 677 (Fla.1985), cert. denied, 474 U.S. 1094, 106 S.Ct. 870, 88 L.Ed.2d 908 (1986); Lara v. State, 464 So.2d 1173 (Fla.1985). The trial court did not err in instructing the jury on a circumstance that was supported by the evidence.
Shere also argues that the trial court erred by finding the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. § 921.141(5)(I), Fla. Stat. (1987). Again we find substantial competent evidence to support the trial court's finding. This circumstance requires proof of heightened premeditation, that is, "the evidence must prove beyond a reasonable doubt that the defendant planned or arranged to commit murder before the crime began." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990); see also, e.g., Rogers, 511 So.2d at 533. There is no evidence to reasonably suggest that Shere and Demo had any motive other than to kill Snyder. They discussed killing Snyder before the murder, they obtained a shovel to bury the body, then they took Snyder to an isolated location where Snyder was shot ten times. See, e.g., Francis, 473 So.2d at 677; Lara, 464 So.2d at 1173.
Id. at 95. It was established by the medical examiner that some ten shots were fired into the body of the victim. The record also reflects that Shere and Demo used the same caliber of weapon in committing the murder, Shere with a .22 caliber rifle, and Demo with a .22 caliber pistol. However, due to the contamination of the victim's body, the medical examiner was unable to establish the order of the shots, or which of the shots was the fatal one. This is significant in light of the fact that the codefendant Demo admitted in his confession to the police that he fired the fatal shot into the victim.
*70 Perhaps the most telling observation of all in the record on this issue is that of the trial judge, who concluded: "The exact nature of Shere's participation in the murder will never be known, but it is clear that Drew Snyder was shot ten times with.22 caliber firearmssix times with a rifle belonging to Richard Shere and four times with a pistol belonging to Bruce Demo." (Emphasis supplied.)[14] Hence, at most, the record reflects a classic case of two equally culpable codefendants. One of them received a life sentence, the other received a death sentence.
This case bears a remarkable similarity to the circumstances involved in Scott v. Dugger, a case discussed above, where the codefendant's sentence was reduced to life after Scott was sentenced, and this Court, finding at least equal culpability, then reduced Scott's sentence to life. The case is also similar in many respects to the facts described in our opinion in Ray v. State, wherein we also reduced a death sentence on the same issue.
Another instructive case is Brookings v. State, 495 So.2d 135 (Fla.1986), where we examined the propriety of an override of a jury recommendation of life when the trial court imposed a death sentence on one of three defendants. Of the two codefendants, one pled guilty to second-degree murder and the other was given total immunity for her testimony. In setting aside the death sentence, we found the jury had properly considered the sentences of the codefendants to be a proper basis for a recommendation of life:
It is clear from our review of the record in this case that the jury's recommendation of life was based on the disparate treatment accorded Murray and Lowery. Appellant's counsel's closing argument during the penalty phase centered almost exclusively on the role Murray and Lowery played in this murder and the different treatment given to these two when compared with the penalty sought against appellant. The trial court, by finding the disparate treatment as mitigating factors, recognized that the treatment of Lowery and Murray were reasonable factors to consider. We are presented here with a factual picture arising from the not infrequent difficult choices confronting prosecuting authorities when deciding who to prosecute and who to plea bargain with. In this case, the testimony of Lowery and Murray was essential to ensure a conviction against appellant. We are not critical of the state's strategic decision here to strike "deals" with Lowery and Murray in order to ensure a conviction against a violent criminal who would murder another human being for money. This kind of deal making is simply a fact of life in our criminal justice system. The issue before us is whether it was reasonable for this jury to consider the treatment given Murray and Lowery when determining what sentence to recommend to the trial court.
This Court has upheld a jury recommendation of life which could have been based, to some degree, on the treatment accorded another equally culpable of the murder. See, e.g., McCampbell v. State, 421 So.2d 1072 (Fla.1982). We have also held that a jury may not compare treatment of those guilty of a different, lesser *71 crime when weighing the propriety of the death penalty. Eutzy v. State, 458 So.2d 755 (Fla.1984),[15]cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985).
We find here that the jury could reasonably consider the treatment of Lowery and Murray and therefore, under the Tedder v. State, 322 So.2d 908 (Fla. 1975) standard, the trial court's override was improper. The jury heard both Lowery and Murray testify about their roles in this homicide. Murray testified that she hired appellant to kill Sadler in order to protect her son from murder charges, and provided appellant and Lowery with money, lodging and transportation both before and after Sadler was killed. Lowery testified that she helped appellant purchase the murder weapon and ammunition, helped devise the plan to lure Sadler from his home in order for appellant to ambush the victim, drove Murray's car to and from the murder scene and ran over Sadler's body after the killing was accomplished. In short, although appellant pulled the trigger, Murray and Lowery were also principals in this contract murder, helping to plan and carry out this crime. That Murray would escape any chance of the death penalty and that Lowery would walk away totally free while the ultimate penalty was sought against appellant, are facts that could reasonably be considered by the jury. Since reasonable people could differ as to the propriety of the death penalty in this case, the jury's recommendation of life must stand.
Id. at 142-43. Thus, we have repeatedly recognized the treatment of codefendants as relevant circumstances for the jury, the judge, and for this Court to consider in determining an appropriate penalty in a capital case.

CONCLUSION
Significantly, nowhere in our prior opinion in Shere's case did this Court consider the life sentence of Demo or his relative culpability. This failure, of course, can be traced directly to appellate counsel's failure to brief the issue. As to prejudice, I would conclude the deficiency in appellate counsel's performance here indeed "compromised *72 the appellate process to such a degree as to undermine confidence in the correctness of the result." Teffeteller v. Dugger, 734 So.2d 1009, 1026 (Fla.1999). Further, as noted above, Shere's sentencing jury was just one vote short of a life recommendation in voting seven to five for death even without knowing of Demo's life sentence. Consequently, in light of the trial court's and this Court's own uncertain posture with regard to the relative culpability of the two defendants here, see Shere, 579 So.2d at 96 ("either Shere or Demo or both fired a rapid succession of gunshots"), combined with the razor-thin vote of the jury, confidence in the correctness of the result can hardly be said not to have been undermined by counsel's failure to assert the disparate treatment of the codefendant in attempting to save appellant's life on appeal.
Under these circumstances, I would conclude Shere has established the requisite inadequacy of counsel and prejudice. Accordingly, under our abundant case law requiring like sentences for like culpability, I would find Shere is entitled to relief. To do otherwise is to wholly ignore the substantial body of case law we have developed on this issue and to invite confusion in the trial courts as to the proper manner in which this issue should be assessed in future cases.
PARIENTE, J., concurs.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] While the sentencing court noted that Demo received a life sentence in its evaluation of the statutory mitigator concerning duress or domination, it did not appear to evaluate the relative culpability of the two defendants or otherwise take Demo's sentence into account in determining Shere's sentence.
[3] Demo was tried separately and sentenced to life imprisonment after Shere had been tried and convicted, but before Shere was sentenced.
[4] Black's Law Dictionary explains the concept of culpability as follows:

"The concept of culpability is used as a reference point to assess the defendant's guilt and punishment even though, in the two contexts, culpability denotes different aspects of the defendant and the murder. At the guilt phase, culpability is most often used to refer to the state of mind that the defendant must possess. Also at the guilt phase, culpability may reflect a broader judgment about the defendant: when he is culpable for his conduct, it means that he is blameworthy and deserves punishment. At the punishment phase, the concept of culpability stands as the benchmark for when the death penalty is an appropriate punishment." Phyllis L. Crocker, Concepts of Culpability and Deathworthiness, 66 Fordham L.Rev. 21, 35-36 (1997).
Black's Law Dictionary 385 (7th ed.1999).
[5] In Buford v. State, 403 So.2d 943 (Fla.1981), this Court held that sexual battery of a child under twelve by a person over eighteen is not punishable by death and is, therefore, not a capital crime.
[6] Even in situations where codefendants are both convicted of first-degree murder, there may be legal obstacles to imposition of the same sentence. For example, in Henyard v. State, 689 So.2d 239 (Fla.1996), we found the defendant's sentence of death proportional even though the codefendant, Alfonza Smalls, could not receive a death sentence because of his age of fourteen:

In this context, then, Smalls' less severe sentence is irrelevant to Henyard's proportionality review because, pursuant to Allen v. State, 636 So.2d 494 (Fla.1994), the aggravation and mitigation in their cases are per se incomparable. Under the law, death was never a valid punishment option for Smalls, and Henyard's death sentences are not disproportionate to the sentence received by his codefendant. Cf. Larzelere v. State, 676 So.2d 394 (Fla.1996) (holding that codefendant's acquittal was irrelevant to proportionality review of defendant's death sentence because codefendant was exonerated from culpability as a matter of law).
Henyard v. State, 689 So.2d at 254-55.
[7] We have identified more than seventy cases which fall into this category.
[8] In Coleman v. State, 610 So.2d 1283 (Fla. 1992), we found proportional a sentence of death where the defendant was convicted of two counts of first-degree murder but the codefendant received a life sentence after his conviction for one count of first-degree murder and one count of second-degree murder.
[9] In Garcia v. State, 492 So.2d 360 (Fla. 1986), this Court upheld a prosecutor's discretion in plea bargaining with a less culpable codefendant and indicated such action does not violate proportionality principles. See also Diaz v. State, 513 So.2d 1045 (Fla.1987); Brown v. State, 473 So.2d 1260 (Fla.1985).
[10] Foster v. State, 778 So.2d 906 (Fla.2000); Ray v. State, 755 So.2d 604 (Fla.2000); McDonald v. State, 743 So.2d 501 (Fla.1999); Fernandez v. State, 730 So.2d 277 (Fla.1999); Jennings v. State, 718 So.2d 144 (Fla.1998); Howell v. State, 707 So.2d 674 (Fla.1998); Gordon v. State, 704 So.2d 107 (Fla.1997); Puccio v. State, 701 So.2d 858 (Fla.1997); Raleigh v. State, 705 So.2d 1324 (Fla.1997); Cole v. State, 701 So.2d 845 (Fla.1997); Hazen v. State, 700 So.2d 1207 (Fla.1997); Sliney v. State, 699 So.2d 662 (Fla.1997); Johnson v. State, 696 So.2d 317 (Fla.1997); Henyard v. State, 689 So.2d 239 (Fla.1996); Bush v. State, 682 So.2d 85 (Fla.1996); Curtis v. State, 685 So.2d 1234 (Fla.1996); Ferrell v. State, 686 So.2d 1324 (Fla.1996); Larzelere v. State, 676 So.2d 394 (Fla.1996); Gamble v. State, 659 So.2d 242 (Fla.1995); Heath v. State, 648 So.2d 660 (Fla.1994); Armstrong v. State, 642 So.2d 730 (Fla.1994); Cardona v. State, 641 So.2d 361 (Fla.1994); Hannon v. State, 638 So.2d 39 (Fla.1994); Steinhorst v. Singletary, 638 So.2d 33 (Fla.1994); Torres-Arboleda v. Dugger, 636 So.2d 1321 (Fla.1994); Colina v. State, 634 So.2d 1077 (Fla.1994); Mordenti v. State, 630 So.2d 1080 (Fla.1994); Williams v. State, 622 So.2d 456 (Fla.1993); Hall v. State, 614 So.2d 473 (Fla.1993); Coleman v. State, 610 So.2d 1283 (Fla.1992); Scott v. Dugger, 604 So.2d 465 (Fla.1992); Robinson v. State, 610 So.2d 1288 (Fla.1992); Sims v. State, 602 So.2d 1253 (Fla. 1992); Jackson v. State, 599 So.2d 103 (Fla.1992); Cook v. State, 581 So.2d 141 (Fla.1991); Hayes v. State, 581 So.2d 121 (Fla.1991); Downs v. State, 572 So.2d 895 (Fla.1990); Campbell v. State, 571 So.2d 415 (Fla.1990); Pentecost v. State, 545 So.2d 861 (Fla.1989); Spivey v. State, 529 So.2d 1088 (Fla.1988); Diaz v. State, 513 So.2d 1045 (Fla.1987); Williamson v. State, 511 So.2d 289 (Fla.1987); Craig v. State, 510 So.2d 857 (Fla.1987); Brookings v. State, 495 So.2d 135 (Fla.1986); Marek v. State, 492 So.2d 1055 (Fla.1986); Garcia v. State, 492 So.2d 360 (Fla.1986); Woods v. State, 490 So.2d 24 (Fla.1986); Deaton v. State, 480 So.2d 1279 (Fla.1985); Hoffman v. State, 474 So.2d 1178 (Fla.1985); Brown v. State, 473 So.2d 1260 (Fla.1985); Troedel v. State, 462 So.2d 392 (Fla.1984); Bassett v. State, 449 So.2d 803 (Fla.1984); Routly v. State, 440 So.2d 1257 (Fla.1983); O'Callaghan v. State, 429 So.2d 691 (Fla.1983); White v. State, 415 So.2d 719 (Fla.1982); Miller v. State, 415 So.2d 1262 (Fla.1982); Tafero v. State, 403 So.2d 355 (Fla.1981); Barfield v. State, 402 So.2d 377 (Fla.1981); Gafford v. State, 387 So.2d 333 (Fla.1980); Downs v. State, 386 So.2d 788 (Fla.1980); Malloy v. State, 382 So.2d 1190 (Fla.1979); Smith v. State, 365 So.2d 704 (Fla.1978); Jackson v. State, 366 So.2d 752 (Fla.1978); Salvatore v. State, 366 So.2d 745 (Fla.1978); Barclay v. State, 343 So.2d 1266 (Fla.1977); Witt v. State, 342 So.2d 497 (Fla.1977); Meeks v. State, 339 So.2d 186 (Fla.1976); Slater v. State, 316 So.2d 539 (Fla.1975).
[11] This Court has rejected proportionality claims where the defendant was determined to be the more culpable. In Jennings, 718 So.2d at 144, for instance, this Court rejected the defendant's argument that his death sentences were impermissibly disparate from his codefendant's sentence of life. Both Jennings and his codefendant were convicted of robbing a restaurant and of murdering three restaurant employees in the process. They were tried separately, under the same judge, and while his codefendant received a sentence of life under the terms of a plea agreement, Jennings received a death sentence. See id. at 153. On appeal, this Court found the sentences to be proportionate. Relying on the proposition that the death penalty is disproportionate where a less culpable defendant receives life, this Court stated that disparate treatment of codefendants is, however, permissible in situations where a particular defendant is indeed more culpable. Therefore, the Court held that "[t]he fact that the eighteen-year-old codefendant received life does not prevent the imposition of the death penalty on Jennings, whom the trial court found to be the actual killer and to be more culpable." Id. at 154.

Likewise, in Sexton v. State, 775 So.2d 923, 925 (Fla.2000), the victim was murdered by Sexton's mentally challenged twenty-two-year-old son, Willie, under Sexton's direction, and Sexton was sentenced to death. Sexton argued on appeal that his death sentence should be reversed because Willie, the actual perpetrator of the crime, received a lesser sentence of twenty-five years' imprisonment. This Court disagreed and affirmed his sentence of death, and found that Sexton was the dominating force behind the murder and that he was "far more culpable than Willie, the actual perpetrator of the homicide." Id. at 936. The Court has found the death sentence proportionate in many cases where the defendant was likewise determined to be more culpable. See, e.g., Howell v. State, 707 So.2d 674, 683 (Fla.1998) ("Based on the evidence presented regarding Howell's greater culpability in the murder as compared to his codefendants, we find that his death sentence is proportional"); Gordon v. State, 704 So.2d 107, 118 (Fla.1997) ("Since Mrs. Davidson and Gordon were not equally culpable, Gordon's death sentence is not disproportionate on the basis of her life sentence.").
[12] Prior to sentencing, defense counsel filed a sentencing memorandum asserting:

Proportionality in the treatment of defendants and co-defendants has been the basis of a major non-statutory mitigating circumstance. On May 4, 1989, co-defendant Bruce Michael Demo was found guilty of Second Degree Murder by a jury and sentenced by Judge John Futch to life imprisonment. Obviously this was based on the same facts and circumstances as proven in Shere's case.
[13] Detective Alan Arick testified that he interviewed Darlene O'Donnel and Bruce Demo. Arick testified that Ms. O'Donnel stated:

Bruce was in the bedroom and she was out in the living room, but there was a thin wall between the two of them and she could hear Bruce sounding like he was angry talking to someone, saying he was angry with Drew, something to the effect that he was tired of Drew's bullshit or something like that. And she was later awake when and then I go into how she was awake when Rick came over to pick up Bruce.
As to the confession he secured from Demo, Arick testified:
Q. After the statement that Mr. Blade said, what was the first thing and how did he begin his confession? What were his exact words? I believe it's a quote in your report.
A. Okay. After he stated that, "he ran out of bullets. That's why he didn't shoot me," he thenMr. Demo realized that he had made an incriminating statement regarding his involvement in the case. So he then made another statement shortly after that.
I guess he was thinking things over in his mind, and he said, "I fired the fatal shot."
Q. What other shots did Mr. Demo tell you he inflicted on Drew Paul Snyder?
A. He told me that he fired two shots into the head of Drew Snyder and a third shot into Mr. Snyder's heart, into the chest area.
Q. Did he tell you where in the head he shot him?
A. Yes. He indicated that the first shot that he fired, Mr. Snyder was laying in the back seat of the car and he believed that he was laying face down, and he fired one shot into the back of Drew Snyder's head.
Q. Did he say he noticed any blood at that time?
A. He said that when the shot was fired, he noticed blood spurting up from Mr. Snyder's head.
Q. What was the next shot he told you he fired?
A. He said that Drew was then pulled from the vehicle. He said they pulled him out. I don't think we clarified which one of them pulled him from the vehicle, but once Drew was on the ground laying face up, then he fired another shot into Mr. Snyder's forehead, into the front of his head.
Q. And then he told you he fired another shot?
A. Yes. He said he fired a third shot into his chest.
Q. Did he tell you who dug the grave?
A. Yes. He said that Richard Shere dug the grave.
Q. Did he say Rick did that voluntarily or that he made him do it?
A. He told us that he made Richard dig the grave.
[14] The State itself emphasized the joint efforts of Demo and Shere during its opening statement:

The evidence will show that there are 10 bullets [sic] wounds or were 10 bullet wounds in the body of Drew Snyder. Seven bullets were recovered from his body. After they shot him, they let him to [sic] die. They loaded him into the trunk of the car and drove him within a mile in the same Ridge manor area to another location.
[15] Note that in Eutzy, the Court was apparently distinguishing between anyone who was or could have been a principal in the first-degree from anyone who might have been an accomplice:

This Court has upheld the reasonableness of jury recommendations of life which could have been based, to some degree, on the treatment accorded one equally culpable of the murder. McCampbell v. State, 421 So.2d 1072 (Fla.1982). In such cases, we have reversed the judge's decision to override the recommendation when the accomplice was a principal in the first degree; Herzog v. State, 439 So.2d 1372 (Fla.1983); McCampbell v. State; when the accomplice was the actual triggerman; Barfield v. State, 402 So.2d 377 (Fla.1981); Slater v. State, 316 So.2d 539 (Fla.1975); when the evidence was equivocal as to whether defendant or the accomplice committed the actual murder; Smith v. State, 403 So.2d 933 (Fla. 1981); Malloy v. State, 382 So.2d 1190 (Fla.1979); Halliwell v. State, 323 So.2d 557 (Fla.1975); or when the accomplice was the controlling force instigating the murder; Stokes v. State, 403 So.2d 377 (Fla. 1981); Neary v. State, 384 So.2d 881 (Fla. 1980). In every case, the jury has had before it, in either the guilt or the sentencing phase, direct evidence of the accomplice's equal culpability for the murder itself. That is not the case before us.
Had it disbelieved Laura's testimony entirely, the jury could have inferred from the facts before it that Laura knew the defendant had taken the gun from her purse. This does not suffice to make her a principal in the first degree, equally as culpable of the homicide as the defendant.
Id. at 759 (emphasis supplied).